STATE OF KANSAS, *Appellant,* v. FRANK DARRELL GUY, a/k/a ARTHUR
LEE JONES, *Appellee,* and

No. 60,814

STATE OF KANSAS, *Appellant,* v. ANTHONY ALBERT STONE, *Appellee.*

(752 P.2d 119)

Opinion filed
March 25, 1988.

*Mickey W. Mosier,* county attorney, argued the cause, and *Robert T. Stephan,*
attorney general, *Julie McKenna,* assistant county attorney, and *Mike Jilka,* legal
intern, were on the brief for the appellant.

*David Gottlieb,* supervising attorney, Kansas Appellate Practice Clinic, of
Lawrence, argued the cause, and *Benjamin C. Wood,* chief appellate defender, of
Topeka, and *Grant Burgoyne,* legal intern, Kansas Appellate Practice Clinic,
were with him on the brief for the appellees.

The opinion of the court was delivered by

MILLER, J.: This is a direct appeal by the State from an order of
the Saline District Court suppressing evidence and discharging
the defendants at the close of a preliminary examination in two
criminal cases. Defendants are Frank Darrell Guy and Anthony
Albert Stone, both of whom were charged with various drug
offenses, possession of drug paraphernalia, and possession or
possession with intent to sell various controlled substances,
including marijuana. The facts in each case were developed
during a joint preliminary examination.

Captain Gary Hindman of the Salina Police Department had
lunch on January 30, 1987, at the Park Inn Motel in Salina. As he
was leaving the motel, about one o'clock p.m., he observed a new
maroon Cadillac sedan pull into the parking lot. The occupants
had long hair, one was dressed in "biker" clothes, and one had
several tattoos on his arms. The car had no license plates but had
a temporary permit in the rear window. One of the men went
inside to the registration desk.

Hindman's suspicions were aroused for several reasons. The

dress and appearance of the pair did not comport with the car they were driving. He had heard there had been narcotics dealings at that motel. He read the window sticker and found that the car was owned by a Colorado rental agency. A telephone check with the agency disclosed that the name of the man who checked into the motel did not match the names of either of the men who had rented the car. Hindman thought it was odd that the defendants checked into the motel at midday. He assigned a detective to observe the car and its occupants.

Detective Don Poore, driving his private and unmarked vehicle, kept the Cadillac under surveillance most of the time from 5:30 o'clock p.m. until it was stopped about four hours later. He saw two men, later identified as Guy and Stone, leave the motel and get into the vehicle. He followed them around town for several hours. They stopped at a filling station, several taverns, and a residence. They talked with several people near the parked car and opened the trunk several times. The men entered several taverns but did not stay very long. Poore never saw the defendants take anything out of the trunk, nor did he see any money or other property change hands. Poore lost sight of the Cadillac several times, once when he returned to the police station and once due to local traffic. Detective Garman was also observing the Cadillac from another unmarked car during the later part of the evening. About 9 p.m. or a little later, the Cadillac headed north on Broadway, over the viaduct onto 9th Street and then east on Interstate 70. Detective Poore followed and maintained a uniform distance between his car and the Cadillac. In order to do so, he reached a speed in excess of 100 miles per hour. The Cadillac appeared to be going the same speed at that time.

Either Poore or Garman, who was also in pursuit, radioed ahead for assistance and other police officers responded. The Cadillac was stopped about 9:25 p.m., one-half mile east of the Abilene exit. Poore parked his car, walked up to the Cadillac, and observed in plain view on the right front floorboard a plastic baggie containing green vegetation which appeared to be marijuana. Both defendants were arrested for possession of marijuana. The discovery of the marijuana was made from outside of the vehicle. A later search of the defendants and of the vehicle uncovered other controlled substances and weapons.

The detectives were interested in stopping the Cadillac and checking the occupants because of their "suspicious activity" in Salina. That was the primary reason for the stop. The record is not clear whether the determination to stop the car was made and the call for assistance initiated before or after the Cadillac was observed traveling at over 100 miles per hour; however, the record is equally clear that the stop was made after that speed was observed. No traffic citation was issued for speeding. The purpose of the officers in making the stop was investigative, to check the occupants of the Cadillac because of what the officers found to be their questionable activity in Salina, recited above. This was not the routine stop of a speeding car by traffic officers on an interstate highway.

The trial court, at the conclusion of the evidence at the preliminary examination, sustained the defendants' motion to suppress the evidence seized at the time of and subsequent to the stop. The court relied upon K.S.A. 22-2402, the Kansas stop and frisk statute, which provides:

"(1) Without making an arrest, a law enforcement officer may stop any person in a public place whom he reasonably suspects is committing, has committed or is about to commit a crime and may demand of him his name, address and an explanation of his actions."

The trial judge found that the officers stopped the car not for speeding but for investigation, and to identify the occupants. He pointed out that no accurate speed measurement was made, and that there was merely an estimate of the speed on the part of Officer Poore; but the judge said, "I have no doubt that these defendants were exceeding the speed limit." He concluded that the defendants were not stopped for speeding, and the officers could articulate no basis for reasonably suspecting that the defendants were committing, had committed, or were about to commit a crime as required by the statute. Therefore, the court suppressed the evidence.

We agree with the trial court that the officers had no articulable basis to stop the defendants for drug-related activity. The officers saw no money or property change hands; they had no information that these defendants had ever been engaged in such activity; they did not identify those persons with whom

defendants talked as being engaged in any unlawful activity; and they saw no violations of the law, not even traffic violations, within the city of Salina. The facts known to the officers, as related by them in the record, were insufficient to provide a reasonable suspicion that at the time the defendants left Salina they were committing, had committed, or were about to commit a crime.

We reviewed the "stop and frisk" cases under K.S.A. 22-2402 in *State v. Epperson*, 237 Kan. 707, 710-12, 703 P.2d 761 (1985). In that case we found that the officer had no reason for suspecting that the defendants were engaged in criminal activity, and we affirmed the action of the trial court in suppressing the items seized in the search that followed the unlawful stop. We stated the rule as follows:

"The 'stop' authorized by K.S.A. 22-2402 requires that a law enforcement officer must have prior knowledge of facts or observe conduct of a person which causes the officer to reasonably suspect that such person is committing, has committed, or is about to commit a crime." *State v. Epperson*, 237 Kan. 707, Syl. ¶ 2.

In the later case of *State v. Baker*, 239 Kan. 403, 720 P.2d 1112 (1986), Justice Holmes explained the rule in a unanimous opinion. He said:

"[A] stop and frisk under [*Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968),] and K.S.A. 22-2402 requires that the officer have a reasonable and articulable suspicion, based on facts known to him or her prior to the stop, that the individual stopped has committed, is committing, or is about to commit a crime." 239 Kan. at 407.

We hold that at the time the defendants left Salina and turned onto Interstate 70 the pursuing officers did not have knowledge of facts giving rise to a reasonable and articulable suspicion that the defendants had committed, were committing, or were about to commit a crime. But the critical time that the officers must have knowledge of such facts is at the time of the actual stop. Here, when the stop was made, an officer had observed the Cadillac being driven at a speed in excess of 100 miles per hour—clearly in excess of the then maximum speed limit on that interstate highway, 55 miles per hour. Under K.S.A. 22-2402, an officer may stop a person whom he sees commit a crime, whether it be a felony, a misdemeanor, or a traffic offense. K.S.A. 1987 Supp. 21-3105, and 22-2402.

The detectives here involved were not traffic officers. They were not driving on Interstate 70 with the primary purpose of enforcing the traffic code. They had a hunch or a suspicion that defendants were involved in drug trafficking, but they had no sound basis, no facts, upon which to reach that conclusion. When the Cadillac exceeded the speed limit by more than 45 miles per hour, however, the law enforcement officers who observed that conduct had a lawful basis upon which to stop the vehicle.

The officers were candid in stating their underlying and principal purpose in pursuing and stopping the vehicle. Had the stop been made as defendants turned onto the Interstate highway, and before either officer observed any unlawful conduct, we would have an entirely different situation. However, that is not the case before us. Detective Poore observed a violation of the law. Whatever his underlying motive, he had the authority and the duty at that point to stop the speeding car.

The trial court observed that Detective Poore made no accurate speed measurement. Radar was not utilized here, as it is in most highway speeding cases. However, the utilization of a private car's speedometer plus the estimate of an experienced officer has been held to be sufficient evidence to support a speeding conviction. See 7A Am. Jur. 2d, Automobiles and Highway Traffic § 371 and cases cited therein. Here, the observation by the officer of speed grossly exceeding the lawful limit was sufficient to cause him to reasonably conclude that the driver of the Cadillac was committing a traffic offense, and thus the stop was lawful.

The trial court erred in holding that the stop was unlawful and in suppressing the evidence for that reason.

The judgment is reversed, and the cases are remanded to the trial court for further proceedings in conformity with this opinion.

LOCKETT, J., concurring: The United States Supreme Court, based on somewhat similar facts, determined that the governmental interest of effective crime prevention and detection underlies the recognition that a police officer may in appropriate circumstances and in an appropriate manner approach a person

for purposes of investigating possible criminal behavior even though there is no probable cause to make an arrest. Where police officers observe individuals go through a series of acts, each of them perhaps innocent in itself, but which taken together warrant further investigation, a police officer may stop the individuals to investigate the possible criminal behavior. *Terry v. Ohio*, 392 U.S. 1, 22, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968).

I believe, based on the facts known by the law enforcement officers prior to the stop, the officers had a reasonable and articulable suspicion that the individuals had committed or were committing violations of the Kansas law, and that the officers acted within the statutory authority of K.S.A. 22-2402 when stopping the two suspects.

Because the stop was lawful and the evidence initially seized was in plain view, the trial court improperly suppressed the evidence.

McFARLAND, J., joins the foregoing concurring opinion.

ALLEGRUCCI, J., dissenting: I respectfully dissent. I agree with the majority's conclusion that the Salina police officers did not have knowledge of facts giving rise to a reasonable and articulable suspicion that the defendants had committed, were committing, or were about to commit a crime. Therefore, the stop of the defendants was not authorized by K.S.A. 22-2402.

The majority further concludes that "the detectives were interested in stopping the Cadillac and checking the occupants because of their 'suspicious activity' in Salina. That was the primary reason for the stop." It was not the primary reason for the stop; it was the only reason for the stop. Both Officers Poore and Garman testified that the defendants' car was stopped because of defendants' "suspicious activity" in Salina, and not for speeding on I-70. That "suspicious activity" justifying the stop was explained by Officer Garman, who was in charge of the overall operation:

"Q. Okay. Would you say that was really the basis for them being stopped, that you were going to find out why they had been in Salina, what they had been doing?
"A. Plus the items that led up to that point, yes, sir.
"Q. What items?
"A. Pardon?

"Q. What items?

"A. Driving a brand new Cadillac, registered under a different name, two subjects dressed as bikers, driving a brand new Cadillac, car backed in at the motel."

One would conclude that had the defendants been cleanshaven with short hair, wearing three-piece suits, and driving a Ford Fairlane, their activities would not have been sufficiently suspicious to justify all the police activity in this case.

The majority found no problem with the police officers' lack of knowledge to justify stopping the defendants for their activities in Salina. The majority simply concludes that the stop was justified because, at the time the defendants were stopped, the officers had observed the Cadillac being driven at a speed in excess of 100 miles per hour. Officer Poore of the Salina Police Department testified that, judging from his speedometer, he estimated that the defendants eventually exceeded 100 miles per hour. However, Officer Poore did not stop the defendants. Officer Garman radioed the Abilene Police Department to stop the defendants' car but did not tell the Abilene Police Department the reason for stopping the defendants. There is no evidence that the Abilene officers observed the defendants speeding. Officer Norton of the Abilene Police Department testified:

"A. Well, no, sir, the Salina detectives were in pursuit of this vehicle and they asked for our backup.

"Q. They really asked you to stop them, didn't they?

"A. To help them, yes, sir.

"Q. Did they tell you what they were chasing them for?

"A. No, sir, not at that time.

"Q. And so, when you stopped this vehicle, you had no reason why you were stopping it, did you?

"A. We were backing up Salina, sir.

"Q. But you were not—The point I'm trying to make, Officer Norton, is that at the time you and Officer Duer stopped this vehicle, you didn't even know why you were stopping it really, did you?

"A. That's correct."

He further testified that Officer Jones of the Abilene Police Department was the first officer on the scene, followed by Officer Norton and the Salina officers behind him. Officer Norton testified:

"Q. You said you were called in to back up the Salina Police Department?

"A. To help stop the vehicle.

"Q. Your job was to stop the vehicle?

"A. Right. To help them if they couldn't.

"Q. They weren't anywhere near in stopping the vehicle, were they?

"A. They were within an eighth of a mile, I would say."

I agree with the majority that the critical time for the requisite knowledge is at the time of the actual stop. The majority concludes that, at the time of the actual stop, an officer had observed the defendants' car being driven at speeds in excess of 100 miles per hour, and that observation was sufficient to cause him to reasonably conclude that the defendants were committing a traffic offense and, therefore, the stop was lawful. The Abilene police officers who actually stopped the defendants' car did not testify that they observed the defendants' car exceeding the speed limit nor that they concluded the defendants had committed a traffic offense. Further, it is not what the police detectives may have done but what they did do that is critical. Justice cannot be measured by what law enforcement officers might have done. Individual rights, whether protected by statute or constitution, are too important to our system of justice to allow the end to justify the means.

The trial court was correct in suppressing the evidence and I would affirm.

PRAGER, C.J., joins the foregoing dissenting opinion.