(939 P.2d 950)

No. 77,374

STATE OF KANSAS, *Appellant*, v. DOUGLAS J. CHAPMAN, *Appellee*.

—

 Opinion filed May 23, 1997.

*Thomas Drees*, county attorney, *Bernard T. Giefer*, former county attorney, and *Carla J. Stovall*, attorney general, for the appellant.

*Willis K. Musick*, of Hays, for the appellee.

Before PIERRON, P.J., ROGG, S.J., and DAN D. BOYER, District Judge, assigned.

PIERRON, J.: This is an interlocutory appeal by the State from an order suppressing evidence obtained pursuant to a stop of a vehicle driven by Douglas J. Chapman. We affirm.

Kansas Highway Patrol Trooper Rich Jimerson stopped Chapman for failing to signal a left-hand lane change on Interstate 70 in Trego County. After the stop, Jimerson made several observations about Chapman and the car, including: Chapman's extreme nervousness, heavy breathing, and avoiding eye contact; a hotel business card on the floorboard with a handwritten phone number on it; and the fact that Chapman was coming from Phoenix, Arizona, and no luggage or other personal items were visible in the car. Jimerson asked Chapman whom the car belonged to. Chapman indicated it was his uncle's and told Jimerson the name of the owner of the car was on the "paperwork" (registration).

Jimerson took Chapman to the police car. A computer search revealed that Chapman's driver's license and the car's registration were valid and the car had not been reported stolen. Jimerson issued a warning for failure to signal a lane change and returned Chapman's license and registration. He instructed Chapman to use his turn signals and told him, "That's all I have for you." Chapman shook Jimerson's hand, said thank you, and started to leave the patrol car.

Before Chapman could leave the car, Jimerson asked if he would mind answering a couple questions. Chapman consented and Jimerson inquired whether Chapman had any drugs or weapons in the car. He replied he did not. Jimerson then asked if he could search the car. Chapman asked why and Jimerson responded that

he had his suspicions and that Chapman was "shaking like a leaf." Without any further response from Chapman, Jimerson called Trooper Rod Taylor, who was approximately a quarter of a mile away, to bring his trained drug dog (K-9 Trooper) to sniff Chapman's car.

When Taylor arrived with K-9 Trooper, Jimerson told Chapman to stand in front of his car. K-9 Trooper sniffed the car and "alerted" to the odor of illegal narcotics or drugs. In a subsequent search, approximately 120 pounds of marijuana were discovered in Chapman's trunk. Chapman was charged with possession of marijuana with intent to sell and no drug tax stamp. After a hearing, the district court granted Chapman's motion to suppress.

In deciding that Chapman was improperly seized after completion of the traffic stop, the district court stated:

"The Court finds that the officer seized both the vehicle and the defendant's person for two reasons.

"1. The defendant was never told he was free to go and in fact was ordered to move to front of the vehicle and had every right to assume that he was being seized at that time and that in fact he was not free to go. The Court finds further that it is silly for the officer to testify that the defendant was in fact free to go after the issuance of the warning ticket when he was out in the middle of rural Trego County with his car being seized and nowhere for him to walk. It is clear from the testimony that the defendant could not walk down the interstate as that would be a violation of Kansas statute. The officer suggested the defendant might have been able to walk down the fence line, but that is silly also in view of the fact that the defendant would be breaking the law if he walked to the fence line. Clearly when the defendant exercised his constitutional right to refuse consent to a search, he was rewarded by having his automobile and his person seized by the officer and detained without probable cause. The information from the officer was that the defendant was nervous. It is the Court's observation that all defendants are nervous when stopped by Highway Patrolman in these types of circumstances.

"2. The testimony of the officer that an indicator of drug trafficking is the fact that the inside of the defendant's automobile was clean and did not have personal items or trash about, flies in the face of other testimony that the same officer has testified to that, trash, water bottles and fast food wrappers in an automobile is also a sign of drug trafficker's [sic] automobiles. All of the other indicators testified to by the officer arise out of the nervousness theory, such as breathing heavy, trembling hands, no eye contact, can all [be] explained by very innocent means. The fact that the defendant was driving from Phoenix to some other point in the

United States, is not a fact that would provide probable cause or in the Court's mind even reasonable suspicion.

"Any search conducted by an official of the government, which is conducted without a warrant, without probable cause and without consent is unreasonable."

Pursuant to Supreme Court Rule 6.09 (1996 Kan. Ct. R. Annot. 36), Chapman submitted a copy of *United States v. Wood*, 106 F.3d 942 (10th Cir. 1997), for our consideration. *Wood* concerns a similar situation involving Officer Jimerson.

The State first argues the standard of appellate review of suppression orders is de novo based on the recent United States Supreme Court decision in *Ornelas v. United States*, 517 U.S. 690, 134 L. Ed. 2d 911, 116 S. Ct. 1657 (1996).

Both parties cite *State v. Garcia*, 250 Kan. 310, 827 P.2d 727 (1992), as setting forth the previous standard of review for examining a suppression order. In *Garcia*, the court utilized a substantial competent evidence standard of review.

"Upon the hearing of a motion to suppress evidence, the State bears the burden of proving to the trial court the lawfulness of the search and seizure. An appellate court will uphold a trial court's suppression of evidence if that ruling is supported by substantial competent evidence."

"If the findings of the trial court on a motion to suppress evidence are based upon substantial evidence this court on review will not substitute its view of the evidence for that of the trial court."

"Substantial evidence is evidence which possesses both relevance and substance and which furnishes a substantial basis of fact from which the issues can reasonably be resolved. Stated in another way, 'substantial evidence' is such legal and relevant evidence as a reasonable person might accept as being sufficient to support a conclusion." 250 Kan. 310, Syl. ¶¶ 1-3.

The State argues we should reevaluate this standard in light of *Ornelas* and should utilize a de novo standard of review. In *Ornelas*, Milwaukee police approached a car with California license plate in a motel parking lot. This car arguably was characteristic of vehicles used by drug couriers. The officers asked the two occupants whether they had any illegal drugs or contraband. The men said no, but consented to a search of the car which revealed cocaine inside an interior panel. A motion to suppress was eventually denied. The Supreme Court set out the proper standard of review to examine the district court's resolution of a motion to suppress:

"We therefore hold that as a general matter determinations of reasonable suspicion and probable cause should be reviewed *de novo* on appeal. Having said this, we hasten to point out that a reviewing court should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." 134 L. Ed. 2d at 920.

*Ornelas* determined that a de novo standard of review would allow appellate courts to maintain control of and clarify the legal principles of reasonable suspicion and probable cause. De novo review would also tend to unify precedent and provide officers with a defined set of rules which in most instances would make it possible to reach a correct determination beforehand as to whether an invasion of privacy is justified in the interest of law enforcement. 134 L. Ed. 2d at 919-20.

On the other hand, Chapman argues the Kansas Supreme Court has *already* expanded the substantial competent evidence standard in reviewing suppression orders. In *State v. Webber*, 260 Kan. 263, 918 P.2d 609 (1996), the trial court allowed the State to introduce evidence that a large sum of money was found in the defendant's purse at the time of her arrest. This evidence was relevant to show the defendant might have been planning to flee after her boyfriend's preliminary hearing. The *Webber* court stated: "In reviewing a trial court decision regarding the suppression of evidence, we review the factual underpinnings of the decision by a substantial competent evidence standard of review and review the ultimate legal decision drawn from those facts de novo with independent judgment." 260 Kan at 274-75.

In *State v. Hopper*, 260 Kan. 66, 917 P.2d 872 (1996), the defendant challenged whether an officer had reasonable suspicion to make a traffic stop which resulted in drunk driving charges. The *Hopper* court reconciled the substantial competent evidence standard of review set in *Garcia* with that in *State v. Vandiver*, 257 Kan. 53, 891 P.2d 350 (1995). In *Vandiver*, the court, on agreed upon facts, held there was no substantial competent evidence that exigent circumstances existed to authorize a search. 257 Kan. at 64. The *Hopper* court concluded *Garcia* and *Vandiver* were not inconsistent and set forth the following standard of review: "The

initial question remains whether the district court's findings are supported by substantial evidence. If so, the appellate court should not reweigh the evidence. However, the ultimate determination of the suppression of evidence is a legal question requiring independent appellate determination. [Citation omitted.]" 260 Kan. at 68-69.

The *Ornelas* standard and that set forth in *Hopper* are not inconsistent. The proper standard of review is that set forth in *Hopper*. We examine the district court's findings to determine whether they are supported by substantial evidence. If so, we will not reweigh the evidence. However, the ultimate determination of the suppression of evidence is a question of law requiring independent appellate determination of the legal issues as applicable to the established facts of the case.

As a preliminary matter, Chapman's failure to signal a lane change provided Jimerson with a reasonable suspicion that Chapman was violating a traffic ordinance and, therefore, the stop was lawful, even if pretextual. See *Whren v. United States*, 517 U.S. 806, 135 L. Ed. 2d 89, 116 S. Ct. 1769 (1996). Consequently, the issues on appeal involve the reasonableness of the detention of Chapman and his car after the completion of the traffic stop, in order to subject it to a canine sniff.

The State first argues the district court erred by requiring a showing of probable cause to support Chapman's temporary detention. It contends the standard to examine the temporary detention is reasonable suspicion. Chapman argues that even if we adopt that standard, Jimerson did not have reasonable suspicion to detain him and his car. We agree with Chapman's analysis.

The State contends Jimerson had reasonable suspicion to suspect Chapman of criminal activity. Jimerson is a highly trained and experienced drug interdiction officer who has seized a considerable amount of illegal drugs. He made several physical observations about Chapman during the traffic stop, including defendant's extreme nervousness, heavy breathing, and avoiding eye contact. He noticed a hotel business card on the floorboard with a handwritten number on it. He noted the interior of the car had no luggage or other personal items. Chapman was also arguably unable to name

the owner of the car (allegedly his uncle). The State contends the totality of these circumstances gave Jimerson reasonable suspicion of drug trafficking activity.

The State also contends Chapman was free to go after the traffic stop had concluded.

The Fourth and Fourteenth Amendments to the United States Constitution prohibit unreasonable seizures as well as searches. *United States v. Brignoni-Ponce*, 422 U.S. 873, 878, 45 L. Ed. 2d 607, 95 S. Ct. 2574 (1975); *State v. Epperson*, 237 Kan. 707, 712, 703 P.2d 761 (1985). The scope and duration of a seizure must be strictly tied to and justified by the circumstances which rendered its initiation proper. *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968); *State v. Damm*, 246 Kan. 220, 224, 787 P.2d 1185 (1990).

Initially, as the district court pointed out, it is a thin argument at best that Chapman was free to go at the end of the traffic stop. Jimerson ordered Chapman to stand in front of his car. Furthermore, it is apparent Jimerson was going to detain Chapman's car regardless of whether he consented. Since a reasonable person in Chapman's position would not have felt free to leave, the encounter turned into an investigatory stop. *State v. Crowder*, 20 Kan. App. 2d 117, 119, 887 P.2d 698 (1994) (there are three types of police-citizen encounters: arrests, investigatory stops, and voluntary encounters.) An investigatory stop is permissible under the Fourth Amendment if supported by reasonable suspicion, *Terry v. Ohio*, 392 U.S. 1, and a warrantless search of a car is valid if based on probable cause, *California v. Acevedo*, 500 U.S. 565, 569-70, 114 L. Ed. 2d 619, 111 S. Ct. 1982 (1991).

The issue for this court to resolve is whether the district court correctly held the factors relied upon by Officer Jimerson did not amount to reasonable suspicion of criminal activity. The Supreme Court in *Ornelas* explained reasonable suspicion and probable cause in the following manner:

"We have described reasonable suspicion simply as 'a particularized and objective basis' for suspecting the person stopped of criminal activity, *United States v. Cortez*, 449 U.S. 411, 417-418, 66 L. Ed. 2d 621, 101 S. Ct. 690 (1981), and probable cause to search as existing where the known facts and circumstances are sufficient

to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found. see *[Brinegar v. United States*, 338 U.S. 160, 175-176, 93 L. Ed. 1879, 69 S. Ct. 1302 (1949)]; *[Illinois v. Gates*, 462 U.S. 213, 238, 76 L. Ed. 2d 527, 103 S. Ct. 2317 (1983)]." 134 L. Ed. 2d at 918.

In *State v. Finley*, 17 Kan. App. 2d 246, 249-51, 838 P.2d 904, *rev. denied* 251 Kan. 940 (1992), this court stated:

"Reasonable suspicion is not the same as probable cause. In *United States v. Sokolow*, 490 U.S. 1, 104 L. Ed. 2d 1, 109 S. Ct. 1581 (1989), the Court conducted a thorough examination into the meaning of reasonable suspicion. The Court stated:

'The officer, of course, must be able to articulate something more than an "inchoate and unparticularized suspicion or 'hunch.'" [Citation omitted.] The Fourth Amendment requires "some minimal level of objective justification" for making the stop. [Citation omitted.] That level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence. We have held that probable cause means "a fair probability that contraband or evidence of a crime will be found," [citation omitted] and the level of suspicion required for a *Terry* stop is obviously less demanding than that for probable cause.' 490 U.S. at 7.

"In *Alabama v. White*, 496 U.S. 325, 330, 110 L. Ed. 2d 301, 110 S. Ct. 2412 (1990), the United States Supreme Court expounded on the differences between reasonable suspicion and probable cause:

'Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause. . . . Reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability. Both factors—quantity and quality—are considered in the "totality of the circumstances—the whole picture" (citation omitted) that must be taken into account when evaluating whether there is reasonable suspicion.'

See also *State v. Hayes*, 3 Kan. App. 2d 517, 597 P.2d 268, *rev. denied* 226 Kan. 793 (1979), for a discussion of the distinction between probable cause and reasonable suspicion.

. . . .

"It is important to remember that . . . the law enforcement officer does not have to *know* that the defendant committed a crime. Merely pointing to some facts that would cause a reasonable person to be suspicious is enough to conduct a *Terry* stop."

In *United States v. Wood*, 106 F.3d 942 (10th Cir. 1997), the court reversed the district court's denial of a motion to suppress

evidence discovered during a search of a car stopped by Jimerson. Jimerson stopped Wood for speeding. During the traffic stop, Jimerson made several observations that raised his suspicion: (1) unusual travel plans; (2) Wood's error in identifying the city where he rented the car; (3) fast food wrappers and open maps in the passenger compartment; (4) extreme nervousness; (5) Wood's prior narcotics conviction discovered during the computer search.

At the end of the traffic stop, Jimerson told Wood he was free to go, but before Wood exited the patrol car, Jimerson inquired if he would mind answering a few questions. Wood consented and Jimerson asked Wood if he was carrying any drugs or weapons. Wood replied "no." Wood refused Jimerson's request to search the car, and Jimerson told Wood he was detaining the car and its contents for a canine sniff. The canine sniff and resulting search revealed illegal drugs in the trunk. 106 F. 3d at 944.

The *Wood* court found all the factors relied upon by Jimerson to be innocent and even the combination of the factors did not rise to the level of reasonable suspicion necessary for an investigatory stop/detention. 106 F.3d at 948.

Wood told Jimerson he was an unemployed painter and he expected to return to work in about 6 weeks. He said he had flown with his sister to Sacramento on a vacation, and she had returned by plane to Topeka while he chose to drive to enjoy the scenery. Jimerson noticed the rental car was due back the next day in Sacramento, to which Wood replied the rental company was aware of his plans to leave the car at his destination.

The *Wood* court disagreed with the district court that Wood's travel plans were unusual. He was on vacation. He had a valid driver's license and a vehicle properly rented in his name. The court stated it was not criminal to want to see the countryside. Wood's work schedule permitted the drive across the country. Even though Wood was unemployed, he could have saved money for the California vacation, gotten the money from a wealthy relative, won the lottery, or put the trip on his credit card. 106 F.3d at 947.

Wood initially said he rented the car in San Francisco, but when corrected by Jimerson, he confirmed he rented the car in Sacra-

mento. The *Wood* court held the error in the city was not the sort of inconsistency that warranted reasonable suspicion. Jimerson testified that California is a known source state for narcotics. The *Wood* court stated there was no evidence in the record that Sacramento is regarded as a source city for drugs, while San Franciso is not. The court held that once Wood corrected his error, the suspicious inconsistencies virtually evaporated. 106 F.3d at 947.

The *Wood* court also rejected Jimerson's reliance on the food wrappers and opens maps in the passenger compartment as a contributing factor. The *Wood* court held this factor to be consistent with Wood's cross-country trip since fast-food wrappers have become ubiquitous in modern interstate travel and can be found in many cars traveling the highways.

The *Wood* court also discounted Wood's nervousness since many citizens, innocent or guilty, exhibit signs of nervousness when confronted by law enforcement officers.

Last, the *Wood* court stated that Wood's prior narcotics conviction did not give rise to reasonable suspicion. Wood truthfully admitted to Jimerson that he had a felony drug history. 106 F.3d at 948.

Chapman contends his and Wood's cases are factually similar except for the cluttered interior and Wood's prior narcotics record. Therefore, this court should find Jimerson lacked sufficient reasonable suspicion.

Chapman also cites *State v. Guy*, 242 Kan. 840, 752 P.2d 119 (1988), where the court stated the actions of the defendant did not rise to a level of reasonable suspicion:

"The dress and appearance [long hair, one defendant wore biker clothes and the other had tattoos on his arm] of the pair did not comport with the car [a new Cadillac] they were driving. He [officer] had heard there had been narcotics dealings at that motel. He read the window sticker and found that the car was owned by a Colorado rental agency. A telephone check with the agency disclosed that the name of the man who checked into the motel did not match the names of either of the men who had rented the car. Hindman thought it was odd that the defendants checked into the motel at midday." 242 Kan. at 840-41.

The officer in *Guy* also testified that while they were tailing the defendants, the defendants stopped at a filling station, several tav-

erns, and a residence. He said the defendants talked to several people and opened the trunk several times, but he never saw them take anything out of the trunk, nor did he see money or other property change hands. The *Guy* court agreed with the trial court that the officers had no articulable basis to stop the defendants for drug-related activity. 242 Kan. at 842.

We are aware the existence of objectively reasonable suspicion of illegal activity does not depend on any one factor, but on the totality of the circumstances. See *State v. Brown*, 22 Kan. App. 2d 560, 561, 920 P.2d 460 (1996). In *State v. Toney*, 253 Kan. 651, 656-57, 862 P.2d 350 (1993), the court stated: "The officer making the stop must be able to articulate the basis for his reasonable suspicion. What is reasonable is based on the totality of circumstances and is viewed in terms as understood by those versed in the field of law enforcement." Even though reasonable suspicion may be founded upon factors consistent with innocent travel, *United States v. Sokolow*, 490 U.S. 1, 9-10, 104 L. Ed. 2d 1, 109 S. Ct. 1581 (1989), "[s]ome facts must be outrightly dismissed as so innocent or susceptible to varying interpretations as to be innocuous." *United States v. Lee*, 73 F.3d 1034, 1039 (10th Cir. 1996); *Reid v. Georgia*, 448 U.S. 438, 441, 65 L. Ed. 2d 890, 100 S. Ct. 2752 (1980).

A majority of the factors relied upon by Jimerson—heavy breathing, avoidance of eye contact, trembling hands, and trembling voice—can be explained as normal nervousness. "We have repeatedly held that nervousness is of limited significance in determining reasonable suspicion and that the government's repetitive reliance on . . . nervousness . . . as a basis for reasonable suspicion . . . 'must be treated with caution.' [Citation omitted.]" *United States v. Fernandez*, 18 F.3d 874, 879 (10th Cir. 1994). It is not uncommon for most citizens, whether innocent or guilty, to exhibit signs of nervousness when stopped by the police. See *United States v. Lambert*, 46 F.3d 1064, 1070-71 (10th Cir. 1995); *United States v. Hall*, 978 F.2d 616, 621 n.4 (10th Cir. 1992); *United States v. Millan-Diaz*, 975 F.2d 720, 722 (10th Cir. 1992). Jimerson had no prior acquaintance with Chapman which would

enable him to contrast Chapman's behavior during the traffic stop with his usual demeanor.

The fact that Chapman's car was clean and there was no luggage and no personal items in the front or back seat does not provide a suspicious circumstance. The district court noted Jimerson's testimony in the case at bar flew in the face of his testimony in other cases that trash, water bottles, and fast-food wrappers characterize a drug trafficker's automobile.

Automobiles were designed so that personal items and luggage can be placed in the trunk, not the passenger compartment. Beyond something out of the ordinary, the normal contents of a car can hardly indicate a drug trafficker. The point is not that drug traffickers will often exhibit such behavior, but that many innocent motorists exhibit precisely the same behavior.

Further, the fact that Jimerson saw a hotel business card on the floorboard with a handwritten phone number on it (which mirrors common drug transportation procedures) can also be dismissed as innocent, although one can also reasonably imagine a nefarious explanation.

Jimerson testified that Chapman told him his trip originated in Phoenix, Arizona. This raised Jimerson's suspicion because Phoenix was a known source area for narcotics and he has had a number of seizures that originated from the Tucson and Phoenix areas. The district court rejected this as a factor sufficient to raise reasonable suspicion. The fact that Chapman was driving from Phoenix to some other point in the United States is not a fact that would provide probable cause or even reasonable suspicion. At oral argument, the State admitted that very large areas of our country can be considered "source areas" for illegal drugs.

When we examine this situation after removing the facially innocuous factors relied on by Jimerson, it does not appear he had reasonable suspicion to detain Chapman and his car. Although the nature of the totality of the circumstances test makes it possible for individually innocuous factors to add up to reasonable suspicion, it is "impossible for a combination of wholly innocent factors to combine into a suspicious conglomeration unless there are con-

crete reasons for such an interpretation." *Karnes v. Skrutski*, 62 F.3d 485, 496 (3d Cir. 1995).

We note that Chapman allegedly did not know the name of his uncle, the person who supposedly owned the car. Jimerson testified this fact is suspicious because drugs are typically transported in a third-party car, meaning a car owned by someone other than the driver. We note, as did the trial court, that nervousness could explain this hesitation. Also, Chapman's handing over the registration papers answered the officer's question concerning ownership. Other suspicions related to ownership of the car would concern the possibility of it being stolen. Once Jimerson confirmed the car was not reported stolen, those suspicions should have been answered.

The State argues the detention of Chapman and his car was reasonably limited in scope and duration as it took only a matter of minutes to call for the drug dog and have it sniff Chapman's car. The State requests we adopt a bright-line rule for such *Terry* stops.

In *United States v. Sharpe*, 470 U.S. 675, 84 L. Ed. 2d 605, 105 S. Ct. 1568 (1985), the Court declined the invitation to establish a bright-line rule for a time limit on a stop pursuant to *Terry*. The court explained:

"In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." 470 U.S. at 686.

In any event, the length of a detention has no bearing on whether the officers had reasonable suspicion for the detention in the first place. For the reasons cited above, we believe they did not.

The evidence of reasonable suspicion in this case is weak. The court in *Wood* stated that to sanction a finding that the Fourth Amendment permits a seizure based on such a weak foundation would be tantamount to subjecting the traveling public to virtually random seizures, inquisitions to obtain information which could then be used to suggest reasonable suspicion, and arbitrary exercises of police power. 106 F.3d at 948. We find the same situation here. Since Jimerson detained Chapman and his car without rea-

sonable suspicion, the subsequent search was unreasonable. The district court did not err in granting Chapman's motion to suppress.

Affirmed.