NOT DESIGNATED FOR PUBLICATION

No. 120,476

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

BRITTANY MIJA MILLER,
*Appellant*.

MEMORANDUM OPINION

Appeal from Johnson District Court; THOMAS KELLY RYAN, judge. Opinion filed May 8, 2020. Affirmed.

*Rick Kittel*, of Kansas Appellate Defender Office, for appellant.

*Jacob M. Gontesky*, assistant district attorney, *Stephen M. Howe*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before GREEN, P.J., POWELL and SCHROEDER, JJ.

PER CURIAM: Brittany Mija Miller appeals the district court's denial of her motion to suppress evidence. She argues that law enforcement illegally seized methamphetamine and drug paraphernalia from her person during a traffic stop, which was then extended into a drug investigation. Because Miller's arguments are unpersuasive, we affirm.

The State charged Miller with possession of methamphetamine and possession of drug paraphernalia. Miller's charges stemmed from her interaction with Sergeant David Rollf during the early morning hours of March 2, 2018. Miller had been the passenger in

Billy Adams' car. After pulling Adams' car over for a traffic violation, Sergeant Rollf became suspicious that Adams may be using or transporting drugs. During the drug investigation that followed, Sergeant Rollf discovered that Miller had an active warrant. And thus, Sergeant Rollf arrested Miller. Following her arrest, Miller disclosed that she had methamphetamine and drug paraphernalia on her person.

Later, Miller moved to suppress the evidence of the methamphetamine and drug paraphernalia found on her person. Miller argued that Sergeant Rollf lacked reasonable suspicion to detain Adams' car to conduct the drug investigation. She then argued that "[b]ecause there was no break between the illegal detention and the discovery of the evidence," Sergeant Rollf's illegal detention "tainted the subsequent discovery of [her] identity, the knowledge of her outstanding warrant, and the recovery of evidence concealed on [her] person." The State responded that the police had reasonable suspicion to conduct the drug investigation based on Adams' behavior during the traffic stop. Alternatively, the State responded that the police would have inevitably discovered Miller's methamphetamine and drug paraphernalia because of Miller's active warrant.

The district court held a hearing on Miller's motion to suppress evidence. Sergeant Rollf's testimony was the only evidence presented at the hearing. Sergeant Rollf testified that he had investigated hundreds, if not thousands, driving under the influence and drug investigations over his 20-year career. He further testified that he has training on the effects of different drugs on the body, such as how a person's eyes react to light and how a person's body moves when under the influence.

Sergeant Rollf explained that around 2 a.m. on March 22, 2018, he was sitting in his patrol car on the side of the road when Adams' car passed him. According to Sergeant Rollf, Adams' car initially caught his attention because it had no working taillights, heavy "rear-end damage," and a "broken out" rear windshield. He explained that based on the heavy damage to Adams' car, he believed it was "not a good decision" to drive the car,

2

especially at night. After this, Sergeant Rollf explained that when he pulled up behind Adams' car, Adams' car made "a very aggressive" left turn from the right lane through a red traffic light. He asserted that based on the severity of Adams' car damage, the severity of the traffic violation, and the fact it was very early in the morning, he immediately suspected that Adams may be under the influence of drugs or in possession of drugs.

Sergeant Rollf next addressed what happened after pulling Adams' car over. According to Sergeant Rollf, after pulling Adams' car over and speaking to Adams, he became even more suspicious of drug use. He explained that after telling Adams why he had pulled his car over, Adams maintained that he had just picked up Miller and they were now going to a nearby Walmart to buy parts to fix his car. Sergeant Rollf testified that Adams' travel plans seemed implausible to him because he believed that Walmart would not have the parts necessary to fix Adams' car and because Adams did not live nearby:

> "It was totally implausible that [Adams] would go from Ottawa[, where he lived,] to somewhere in northern Johnson County to pick up a friend, knowingly having heavy rear-end damage, no working lights, in the middle of the night, only to stop somewhere in the middle to suddenly have to fix his car."

Moreover, Sergeant Rollf testified that he was suspicious of Adams' appearance and mannerisms. He asserted that Adams' pupils remained constricted even when no light shined on them. And his speech and body movements were rapid. Sergeant Rollf explained that constricted pupils indicated opiate use while rapid speech and body movements indicated stimulant use. He further explained that habitual drug users often take both suppressants and stimulants together to counter the negative effects of each drug. In addition to the preceding, Sergeant Rollf testified that Adams avoided eye contact with him when explaining his travel plans, which made him question the veracity of his travel plans. This included Adams' contention that Miller was a friend. Sergeant

3

Rollf explained that it seemed that Adams, Miller, and the other person in Adams' car did not really know each other, which was also "indicative of . . . the drug world."

Sergeant Rollf testified that he spoke to Adams for about two or three minutes before going back to his patrol car to complete Adams' traffic ticket. Yet, he further testified that based on Adams' behavior during this initial contact, Sergeant Rollf believed that Adams was driving under the influence or transporting drugs. On that basis, Sergeant Rollf explained that when he returned to his patrol car, he asked for the closest K9 unit to come to his location to conduct a dog sniff of Adams' car.

Next, Sergeant Rollf testified that the K9 unit arrived before he gave Adams the traffic ticket. And he testified that once the K9 unit arrived, he asked Adams as well as the passengers of Adams' car to get out of the car so the K9 unit could safely conduct the dog sniff. It is unclear from the record on appeal when exactly Sergeant Rollf gave Adams the traffic ticket. Regardless, Sergeant Rollf testified that he spoke to Adams, Miller, and the other passenger in Adams' car while the K9 unit conducted the dog sniff. Sergeant Rollf alleged that during this conversation, both Miller and the other passenger repeated Adams' contention that they were going to Walmart to buy parts to fix Adams' car.

Sergeant Rollf testified that while this conversation was occurring, the K9 unit did a loop around the car and indicated the presence of drugs. According to Sergeant Rollf, at this juncture, he began searching Adams' car for drugs while another officer asked for the passengers' identification. He testified that the other officer "ran [Miller's] information through the computer system and found out that she had a warrant." As a result, Miller was arrested. Sergeant Rollf then testified that following her arrest, he warned Miller that if she brought drugs into the county jail, she would be charged with trafficking contraband. He testified that it was at this point, Miller told him that she had methamphetamine and drug paraphernalia on her person.

4

Finally, Sergeant Rollf testified that he found no drugs inside Adams' car. And he testified that Adams passed the field sobriety testing that occurred after Miller's arrest. So, Sergeant Rollf never arrested Adams. Instead, after giving Adams his traffic ticket, Sergeant Rollf allowed Adams and his other passenger to drive away.

At the end of the hearing, the district court took the parties' arguments under advisement. The district court later denied Miller's motion for several reasons. First, the district court emphasized Adams' traffic violation, which included no taillights and driving through a red traffic light while turning left from the right lane. The district court found that Adams' driving was an indicator of impairment or other illegal activity. Then, the district court found that other factors indicated that Adams was engaging in illegal activity. Those factors included Adams' constricted pupils, rapid speech, rapid body movements, and implausible story about going to Walmart to fix his car. The district court then found that the preceding factors provided Sergeant Rollf with more than "just a hunch" that Adams was engaging in criminal activity.

With that in mind, the district court concluded that Sergeant Rollf had reason to extend the traffic stop for the purpose of conducting a drug investigation. Because law enforcement discovered Miller's outstanding warrant while searching Adams' car, the district court ruled that the discovery of Miller's warrant occurred during a permissible extension of the initial stop. In turn, the district court ruled that law enforcement properly discovered the methamphetamine and drug paraphernalia on Miller's person.

Next, the parties held a bench trial before the district court on stipulated facts. In the end, the district court found Miller guilty of methamphetamine and drug paraphernalia possession. It then sentenced Miller to a controlling sentence of 18 months' probation with an underlying controlling sentence of 10 months' imprisonment followed by 12 months' postrelease supervision.

Miller timely appealed.

*Did the District Court Err By Denying Miller's Motion to Suppress?*

An appellate court uses a bifurcated standard of review when considering the district court's denial of a motion to suppress. First, an appellate court reviews the district court's factual findings for substantial competent evidence. Second, an appellate court reviews the district court's ultimate legal conclusions de novo. *State v. Hanke*, 307 Kan. 823, 827, 415 P.3d 966 (2018). Moreover, when considering the district court's factual findings, an appellate court does not reweigh the evidence or reassess credibility determinations. 307 Kan. at 827.

The Fourth Amendment to the United States Constitution protects people against unreasonable searches and seizures. *State v. Sharp*, 305 Kan. 1076, 1081, 390 P.3d 542 (2017). "In order for a law enforcement officer's seizure of a citizen to be constitutionally reasonable, the officer must know of specific and articulable facts that create a reasonable suspicion the seized individual is committing, has committed, or is about to commit a crime or traffic infraction." *State v. Jones*, 300 Kan. 630, 637, 333 P.3d 886 (2014). When law enforcement officers conduct a search or seizure in violation of the Fourth Amendment, the district court must suppress all evidence obtained because of the illegal search or seizure. *State v. Cleverly*, 305 Kan. 598, 614, 385 P.3d 512 (2016).

Miller here concedes that Sergeant Rollf had reasonable suspicion to stop Adams' car because Adams committed a traffic infraction. Furthermore, Miller does not challenge the length of the stop. That is, she does not argue that Sergeant Rollf unreasonably prolonged the stop during his initial contact with Adams or while waiting for the K9 unit to arrive. Nor does she challenge her detention as a passenger of Adams' car. Instead, Miller's sole argument is that Sergeant Rollf lacked reasonable suspicion after his initial

6

interaction with Adams to extend the traffic stop for the purpose of carrying on a drug investigation by calling the K9 unit.

In making this argument, Miller contends that Sergeant Rollf's interactions with Adams did not create reasonable suspicion to believe that he was under the influence of illegal drugs or transporting illegal drugs. Thus, she argues that "illegality occurred [], when [Sergeant] Rollf, in the absence of adequate suspicion, called the dog to the scene immediately after his brief, initial encounter with the driver." In particular, Miller takes issue with Sergeant Rollf's testimony in support of his suspicion. In doing so, Miller argues that Sergeant Rollf's belief that Adams was under the influence or transporting drugs was undermined by the following: (1) that it was possible that Adams usually spoke and moved rapidly; (2) that it was possible Adams was going to Walmart to fix his broken taillights; (3) that Sergeant Rollf did not smell or see any illegal drugs or contraband in Adams' car; and (4) that Sergeant Rollf ultimately did not arrest Adams for anything.

The State counters that "a review of the factual findings made by the district court, and the legal conclusion it drew from them, shows [that Sergeant] Rollf's progressive investigation was legally justified from its inception through the recovery of the contraband from [Miller]." Alternatively, the State argues that the inevitable discovery doctrine bars suppression of the evidence. Simply put, the State's primary argument is persuasive.

The first problem with Miller's argument is that it hinges on reweighing the evidence before the district court. Miller complains that Adams' rapid speech and body movements did not provide Sergeant Rollf with reasonable suspicion because Sergeant Rollf did not know whether Adams usually spoke and moved rapidly. And she also complains that Sergeant Rollf ignored that Adams may have actually been going to

7

Walmart to fix his taillight. Yet, this argument involves reweighing the evidence in her favor.

The district court here clearly made a credibility determination in favor of Sergeant Rollf. As a result, it believed Sergeant Rollf's testimony that Adams' speech and mannerism indicated impairment. It also believed Sergeant Rollf's suspicion concerning Adams' story about going to Walmart to repair his heavily damaged car around 2 a.m. Because we are not in a position to reweigh the evidence or credibility determinations, Miller's complaint about Sergeant Rollf's testimony necessarily fails. See *Hanke*, 307 Kan. at 827.

Next, Miller's argument about Sergeant Rollf not smelling or seeing any drugs in Adams' car ignores that the district court explicitly noted this fact before ruling: "Now, he did say in his cross-examination, Sergeant Rollf stated he did not see or smell anything suspicious." And so, the district court considered the absence of drug odors or visible drug use. Yet, even with this knowledge, the district court found that other evidence provided Sergeant Rollf with reasonable suspicion to extend the traffic stop.

Additionally, Miller's argument about Sergeant Rollf not smelling or seeing drugs ignores that courts determine reasonable suspicion based on the totality of the circumstances. Because we use the totality of the circumstances standard, this court has previously explained that innocent behavior during a traffic stop is irrelevant:

> "The relevant inquiry is not whether particular conduct is innocent or guilty but whether a
> sufficient degree of suspicion attaches to particular types of noncriminal acts. The totality
> of the circumstances standard precludes a divide-and-conquer analysis under which
> factors that are readily susceptible to an innocent explanation are entitled to no weight."
> *State v. Arceo-Rojas*, 57 Kan. App. 2d 741, Syl. ¶ 13, 458 P.3d 272 (2020).

Miller's next argument, which hinges on the fact that Sergeant Rollf ultimately did not arrest Adams, is similarly flawed. In short, Miller's argument nitpicks at individual factors Sergeant Rollf relied on to extend the traffic stop instead of considering all of the factors Sergeant Rollf relied on to the extend the traffic stop together. This clearly violates our totality of the circumstances standard or review. See *Arceo-Rojas*, 57 Kan. App. 2d 741, Syl. ¶ 13.

Also, this argument ignores that the existence of reasonable suspicion hinges on the facts known to law enforcement when making the decision to extend a traffic stop for the purpose of pursuing an investigation of another crime. Thus, when considering the existence of reasonable suspicion, we do not consider whether law enforcement correctly suspected that a driver was under the influence or transporting drugs. For that reason, courts apply the reasonable suspicion standard instead of the more burdensome probable cause standard when considering a traffic stop extension. 57 Kan. App. 2d 741, Syl. ¶ 12.

Besides, in this case, multiple factors supported the existence of reasonable suspicion. To review, Sergeant Rollf testified that he suspected that Adams was using or transporting drugs for the following reasons: (1) because it was early in the morning; (2) because of the extent of damage to Adams' car; (3) because of the severity of Adams' traffic violation, which included no taillights, turning left from a right lane, and driving through a red traffic light; (4) because of the implausibility of Adams' story that he was going to Walmart to buy parts to fix his car; (5) because Adams did not seem to know Miller or his other passenger; (6) because Adams' pupils were constricted, his body movements were rapid, and his speech was rapid; and (7) because Adams avoided eye contact when discussing his travel plans.

Most importantly, Miller does not contest that Adams conducted himself in the preceding behavior. She simply argues that the preceding behavior was not so strange to

9

create reasonable suspicion that Adams was driving under the influence or transporting drugs.

In her brief, Miller does not cite any comparable cases to support her argument that Adams' behavior did not provide Sergeant Rollf reasonable suspicion to extend the traffic stop. Indeed, Miller's case seems to be unique. A review of Kansas caselaw does not reveal a case with the exact facts of Miller's case. Nevertheless, a review of a couple of cases where Kansas appellate courts have held that the law enforcement officer lacked reasonable suspicion to extend a traffic stop is helpful because those cases are clearly distinguishable from Miller's case.

The first helpful case is *Jones*, 300 Kan. at 646. There, the law enforcement officer observed a driver "backtrack[ing]," "not driv[ing] in a purposeful direction," not using her turn signal, and slurring her speech. After stopping the driver, the officer also observed an empty plastic baggie in the driver's car. Yet, our Supreme Court held that the preceding factors did not create reasonable suspicion to extend the traffic stop into a drug investigation.

In reaching this holding, our Supreme Court negated the law enforcement officer's observations of the driver's erratic driving and a plastic baggie in the front seat:

> "[A]s a matter of common sense, driving in an unusual travel pattern cannot by itself be a license to search a vehicle; if it was, the Fourth Amendment would offer no protection to a driver who is driving in an unfamiliar area and approaches an address from different directions in an attempt to spot a particular house number.
> "Adding the officer's observation of the clear, empty plastic baggie does not significantly add to the suspicion. Common sense suggests that if the bag had been used to package illegal substances, Jones or her companions would have hidden the bag along with its contents. There is no evidence of an attempt to do so before, during, or after the stop." 300 Kan. at 647-48.

10

The second helpful case is *State v. Chapman*, 23 Kan. App. 2d 999, 939 P.2d 950 (1997). There, a law enforcement officer pulled a driver over after he failed to use a turn signal. During the stop, the officer observed that the driver was extremely nervous, was unable to name the owner of the car he was driving, was breathing heavily, and was avoiding eye contact. The officer also observed a business card on the floorboard of the car with a handwritten phone number on it, which "mirror[ed] common drug transportation procedures." 23 Kan. App. 2d at 1010. Also, the officer reported that the driver claimed to be traveling but had no luggage.

But this court held that the preceding factors did not provide the officer with reasonable suspicion to extend the traffic stop to conduct a drug investigation. 23 Kan. App. 2d 999, Syl. ¶ 9. This court explained that the driver's odd behavior during the stop could be explained by nervousness. It found that the lack of luggage in the cabin of his car was irrelevant because the driver could have placed his luggage in the trunk. Further, this court found that there could be an innocent explanation for the business card with the phone number on it on the floorboard of the car. 23 Kan. App. 2d at 1010.

Turning our attention back to Miller's case, we note that Miller's case is distinguishable from the *Jones* and *Chapman* cases. Unlike in the *Jones* and *Chapman* cases, Sergeant Rollf saw Adams commit multiple traffic violations. More importantly, those traffic violations—driving without taillights, turning left from the right lane, and driving through a red traffic light—were more severe traffic infractions than the turn signal violations at issue in *Jones* and *Chapman*. And neither the *Jones* nor *Chapman* cases involved cars that the law enforcement officer described as heavily damaged and unsafe to drive. This made the very fact that Adams was driving his car suspicious.

Next, in both the *Jones* and *Chapman* cases, the courts emphasized that many of the factors that the law enforcement officers relied on for the existence of reasonable

11

suspicion could have innocent explanations. Here, we may attribute Adams' rapid speech, rapid body movements, and avoidance of eye contact to nervousness. But nervousness does not explain his constricted pupils. Nervousness does not explain his implausible travel plans of driving a heavily damaged car across the county in the middle of the night to buy parts to fix his car at Walmart. Nor does nervousness explain Adams' apparent unfamiliarity with Miller and the other passenger. Thus, unlike the *Jones* and *Chapman* cases, not all of the factors that Sergeant Rollf relied on could be attributed to Adams' nervousness.

Finally, it is worth repeating that Sergeant Rollf had over 20 years of experience conducting drug investigations. Although this court does not entirely defer to a law enforcement officer's opinion concerning reasonable suspicion, we do give deference to an officer's training and experience. *Jones*, 300 Kan. at 647. Thus, we must consider Sergeant Rollf's more than two-decade experience involving drug investigations, as well as all of Sergeant Rollf's observations during Adams' traffic stop. Simply put, with those considerations in mind, substantially more evidence supported the existence of reasonable suspicion in this case when compared to the *Jones* and *Chapman* cases. As a result, we conclude that Adams' highly unusual behavior provided Sergeant Rollf with reasonable suspicion to extend the traffic stop to conduct a drug investigation under the totality of the circumstances.

And we further conclude that the district court correctly denied Miller's motion to suppress. So, we conclude that it is unnecessary for us to consider the State's alternative inevitable discovery doctrine argument.

Affirmed.