Nos. 78,065
78,066

STATE OF KANSAS, *Appellant,* v. JOSEPH DeMARCO, *Appellee.*
STATE OF KANSAS, *Appellant,* v. RAYMOND BENNICI, *Appellee.*

(952 P.2d 1276)

Opinion filed January 23, 1998.

*Joe Shepack,* county attorney, argued the cause, and *Carla J. Stovall,* attorney general, was with him on the brief for appellant.

*Howard A. Sohn,* of Miami, Florida, argued the cause and was on the brief for appellee DeMarco. *Michael K. Sheahon,* of Sweet & Sheahon, of Salina, argued the cause for appellee Bennici and was on the briefs for both appellees.

The opinion of the court was delivered by

SIX, J.: This is a Fourth Amendment traffic stop search and seizure case. The question is whether the officer made a valid stop and, if so, whether he thereafter had reasonable and articulable suspicion that the defendants were engaged in illegal activity.

The State appeals dismissal of the complaints against defendants Joseph DeMarco and Raymond Bennici for possession of marijuana with intent to distribute. The district court granted defendants' motions to suppress evidence, 190 pounds of marijuana, found in the trunk of the rental car. Our jurisdiction is under K.S.A. 22-3602(b)(1) (the State's appeal from an order dismissing a complaint).

We hold that the traffic stop, because of an unsignaled lane change, K.S.A. 8-1548, was valid. However, the district court was correct in finding that the detention was unreasonable and in dismissing the complaints after granting defendants' motions to suppress.

## FACTS

At approximately 8:45 a.m. on February 17, 1996, Trooper Michael Weigel, after completing a traffic stop on Interstate 70, entered his patrol car, which was parked on the right shoulder of the eastbound lanes. When he looked in his rear-view mirror to check for traffic, he saw the defendants' car approaching from the west. The car made a lane change from the outside (right) to the inside (left or passing) lane without signaling. After the car passed Weigel, it signaled a lane change to return to the outside lane. The car had an out-of-state temporary tag in the back window. He pulled onto the highway and accelerated to catch the car. Weigel drove alongside to see if the occupants, DeMarco and Bennici, were wearing seat belts. They were. He pulled the car over and started the video camera mounted in his patrol car.

Weigel explained to defendants why he made the stop and told them he was not going to give them a ticket. DeMarco, the driver,

talking rapidly, said that he did not want to endanger Weigel and apologized for not signaling. Weigel asked where they were coming from. DeMarco said "Los Angeles" and added that they had stopped in Salt Lake City to visit relatives. Weigel asked if the car was rented. DeMarco responded that it was rented by himself and Bennici's brother and handed over the rental documentation. Weigel requested DeMarco's driver's license and Bennici's identification. Weigel called the dispatcher to check on any outstanding warrants on either DeMarco or Bennici, their licenses, and their criminal history.

While waiting to hear from the dispatcher, DeMarco, who was wearing a short-sleeved shirt, agreed to come to the patrol car. Weigel asked where they were from and where they were heading. DeMarco said he was from Florida, adding that "we" had driven to Los Angeles, vacationing there about 3 days before renting the car to return to Florida. DeMarco was not asked who he included in "we." From other statements DeMarco made then, it appears that DeMarco, Bennici's brother, and another friend had traveled by car from Florida to Los Angeles. Bennici's brother flew back to Florida, and the other friend left to return to Florida before DeMarco and Bennici left California. However, Weigel believed that "we" included DeMarco and Bennici. From DeMarco's statements, it was not clear if Bennici was included in "we" and if DeMarco was telling Weigel that Bennici also was in the group that drove from Florida to Los Angeles.

Weigel asked Bennici about his trip to Los Angeles and how long Bennici had been there. Bennici said that he had flown to Los Angeles and had been there about 3 days. DeMarco had arrived in Los Angeles before Bennici did. Weigel asked Bennici how DeMarco had traveled to Los Angeles, and Bennici said that he was "pretty sure" DeMarco had flown in. Weigel returned to his patrol car and asked DeMarco how he and Bennici had traveled to Los Angeles. DeMarco said that he had driven and Bennici had flown to Los Angeles.

The rental car documentation was in order, showing that the car was rented up to February 20, 1996. At approximately 9:03 a.m., the dispatcher notified Weigel that the driver's licenses checked

out as valid. However, when Weigel asked about criminal history, the dispatcher said that it was "still printing" which, according to Weigel, meant that a lengthy criminal record was printing out on one or both defendants. Weigel issued a warning ticket to DeMarco, returned his paperwork to him, and then asked if he could search the trunk of the car. DeMarco refused to consent to the search. As the conversation continued, Weigel asked for consent to search on several occasions and each time was refused. At 9:05 a.m., Weigel called the dispatcher and requested the canine unit.

Approximately 20 minutes later, Trooper Heim arrived with a narcotics dog. The dog immediately jumped at the trunk of the rental car, scratching vigorously, showing that it smelled drugs. The troopers opened the trunk and discovered approximately 190 pounds of marijuana packaged in luggage.

DeMarco and Bennici were bound over for trial at the preliminary hearing.

### The Suppression Hearing

Trooper Weigel identified eight indicators or factors at the suppression hearing which caused him to be suspicious that DeMarco or Bennici may have been concealing drugs: (1) DeMarco was nervous when first approached, and this nervousness escalated. He was overly talkative and fidgety. His hands were shaking when he first handed over the rental documents. (2) DeMarco said they were coming from Los Angeles, which is a major source city for narcotics. (3) DeMarco and Bennici were taking an out-of-the-way route to travel from Los Angeles to Florida. (4) They were traveling in a rental car (drug traffickers frequently use rental vehicles to haul large quantities of drugs). One of the renters, Bennici's brother, was absent, which is also common with drug traffickers. (5) Their route, I-70, is a major drug courier highway. (6) The rental contract showed that the car was to be returned on February 20, 1996, allowing 3 days to drive to Florida. (7) DeMarco and Bennici had inconsistent stories about how DeMarco had traveled to Los Angeles from Florida. (8) Before asking for consent, Weigel learned from the dispatcher that the computer was printing out a criminal record of some type on one or both of the defendants.

Weigel did not mention factors (3), (5), (6), and (8) during the preliminary hearing.

In Weigel's view, DeMarco's refusal to consent to the search was significant because "the majority of the time if I have somebody [who] refuses to consent we find drugs if the dog is called." However, Trooper Weigel acknowledged that the refusal is "after the fact."

Trooper Weigel underwent extensive cross-examination by both defense attorneys. Weigel did not observe any other eastbound traffic between his vehicle and DeMarco's as DeMarco approached and passed the patrol car. There was no vehicle behind DeMarco when DeMarco made the unsignaled lane change. Weigel acknowledged that there are other major drug source cities on the West Coast or in the Southwest, such as San Diego, Tucson, El Paso, or San Antonio. Weigel had never met DeMarco before and did not know whether he was normally an overly talkative, fidgety person who moved his hands while talking. Weigel acknowledged that I-70 ends somewhere around Salt Lake City.

Weigel admitted that he had previously arrested persons for transporting drugs in private vehicles and also in rental cars. Before stopping DeMarco's car, Weigel had stopped four vehicles that morning, all with out-of-state tags.

The district court found that the traffic stop was "pretextual and therefore unlawful" in that only cars with out-of-state tags were being stopped. Also, the seizure of DeMarco and Bennici was improperly long for a turn signal violation, and there was no reasonable suspicion for warrants checks. The district court held that there was no reasonable justification for requiring identification from Bennici and that the seizure of Bennici while running the records check was unreasonable.

The district court observed that of the four factors Weigel identified at the preliminary hearing, three of them were subjective (nervousness, use of a rental car, driving from Los Angeles) and only one was objective (inconsistency in DeMarco's and Bennici's stories about how DeMarco traveled to Los Angeles from Florida). The judge felt that inconsistency was weakened because DeMarco

and Bennici did not arrive in Los Angeles at the same time. The marijuana was suppressed as "fruit of the poisonous tree."

## DISCUSSION

We review the factual underpinnings of the district court's suppression decision by a substantial competent evidence standard and the ultimate legal conclusion drawn from those facts by a de novo standard.

We do not reweigh the evidence. However, the ultimate determination of suppression is a legal question requiring our independent determination. *State v. Hopper*, 260 Kan. 66, 68-69, 917 P.2d 872 (1996). See also *State v. Chapman*, 23 Kan. App. 2d 999, 1003-04, 939 P.2d 950 (1997) (applying the *Hopper* standard of review in a traffic stop case involving facts similar to those here and determining that standard not to be inconsistent with *Ornelas v. United States*, 517 U.S. 690, 134 L. Ed. 2d 911, 116 S. Ct. 1657 [1996]).

### The Traffic Stop

The State bears the burden of proving the lawfulness of the search and seizure at the hearing on a motion to suppress. *State v. Garcia*, 250 Kan. 310, Syl. ¶ 1, 827 P.2d 727 (1992).

Trooper Weigel stopped DeMarco after observing a failure to signal a lane change. K.S.A. 8-1548 provides in part:

"(a) No person shall turn a vehicle or move right or left upon a roadway unless and until such movement can be made with reasonable safety, nor without giving an appropriate signal in the manner hereinafter provided.

"(b) A signal of intention to turn or move right or left when required shall be given continuously during not less than the last one hundred (100) feet traveled by the vehicle before turning."

DeMarco asserts that he did not violate K.S.A. 8-1548. DeMarco compares his situation to that of the defendant driver in *Bowers v. State*, 221 Ga. App. 886, 473 S.E.2d 201 (1996). *Bowers* reversed the trial court's denial of a motion to suppress, finding that there was no probable cause for a traffic stop based on a lane change violation. The Georgia statute, Ga. Code Ann. § 40-6-123 (1997), differs from K.S.A. 8-1548.

*Bowers* interpreted the Georgia statute as making the signal requirement conditional on moving traffic existing either in front of or behind the vehicle making the lane change. K.S.A. 8-1548 requires a lane change signal within 100 feet of the point where the vehicle makes the lane change, regardless of whether there is any traffic moving in front of or behind the vehicle.

When there is moving traffic in the vicinity of the vehicle making a lane change is not the only situation when a signal is required. Here, Weigel's patrol car was parked on the right shoulder forward of DeMarco at the time the unsignaled lane change was made. The driver of a vehicle parked on the shoulder is entitled to a lane change signal to safely time reentry onto the roadway. Weigel's testimony established that he had probable cause to make the traffic stop.

Weigel observed DeMarco commit a traffic violation. The stop was valid regardless of Weigel's motives. *Whren v. United States*, 517 U.S. 806, 812, 135 L. Ed. 2d 89, 116 S. Ct. 1769 (1996); K.S.A. 22-2402; *United States v. Anderson*, 114 F.3d 1059, 1063 (10th Cir. 1997); see *Garcia*, 250 Kan. 310 (although suppressing evidence on other grounds, district court found unsignaled lane change as reason for traffic stop facially valid); *State v. Gray*, 242 Kan. 840, 843, 752 P.2d 119 (1988), and *Chapman*, 23 Kan. App. 2d at 1004 ("Chapman's failure to signal a lane change provided [Trooper] Jimerson with a reasonable suspicion that Chapman was violating a traffic ordinance and, therefore, the stop was lawful, even if pretextual.").

## Scope and Length of Detention

We next consider the detention of DeMarco and Bennici after the traffic stop. A routine traffic stop is a seizure under the Fourth Amendment. *United States v. Botero-Ospina*, 71 F.3d 783, 786 (10th Cir. 1995), *cert. denied* 518 U.S. 1007 (1996). We said in *State v. Damm*, 246 Kan. 220, 224, 787 P.2d 1185 (1990): "the Fourth and Fourteenth Amendments prohibit unreasonable seizures as well as searches. [Citations omitted]The scope and duration of a seizure must be strictly tied to and justified by the circumstances which rendered its initiation proper. *Terry v.*

*Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968)." An investigative detention must last no longer than is necessary to effectuate the purpose of the stop. *Florida v. Royer*, 460 U.S. 491, 500, 75 L. Ed. 2d 229, 103 S. Ct. 1319 (1983). "In summary, a 'stop and frisk,' under *Terry* and our statute, [K.S.A. 22-2402(1),] requires that the officer have a reasonable and articulable suspicion, based on fact, that the person stopped has committed, is committing, or is about to commit a crime." *State v. Epperson*, 237 Kan. 707, 712, 703 P.2d 761 (1985). In *Epperson* we affirmed a suppression order, noting: "The officer was suspicious but he had no objective facts upon which to form a belief that the men were involved in criminal activity." 237 Kan. at 713.

The computer check activity here is permissible. *United States v. Mendez*, 118 F.3d 1426, 1429 (10th Cir. 1997). However, once the check confirms a proper license and entitlement to operate the car, the driver must be allowed to proceed without further delay or questioning. We agree with the reasoning in *Mendez* that

"[f]urther questioning is permissible only if (1) 'the encounter between the officer and the driver ceases to be a detention, but becomes consensual, and the driver voluntarily consents to additional questioning,' [citation omitted], or (2) during the traffic stop the officer gains a reasonable and articulable suspicion that the driver is engaged in illegal activity. [Citation omitted.]" 118 F.3d at 1429-30.

See *Anderson*, 114 F.3d at 1064.

Here the stop did not become a voluntary encounter. Weigel acknowledged that at no time during the traffic stop were either of the defendants free to go. This case turns on whether Weigel, without unlawfully exceeding the scope of the traffic stop detention, had gained a reasonable and articulable suspicion of criminal activity sufficient to justify searching the trunk.

We said in *State v. Toney*, 253 Kan. 651, 656, 862 P.2d 350 (1993): "The officer making the stop must be able to articulate the basis for his reasonable suspicion. What is reasonable is based on the totality of circumstances and is viewed in terms as understood by those versed in the field of law enforcement." In reviewing factors advanced by the government to prove reasonable and articulable suspicion, the Tenth Circuit said in *Mendez*:

"When evaluating these factors, we judge the officer's conduct in light of common sense and ordinary human experience. [Citation omitted.] 'Our task . . . is not to pigeonhole each purported fact as either consistent with innocent travel or manifestly suspicious,' [citation omitted], but to determine whether the totality of the circumstances justify the detention. [Citation omitted.] We make our determination with deference to a trained law enforcement officer's ability to distinguish between innocent and suspicious circumstances, [citation omitted], remembering that reasonable suspicion represents a 'minimum level of objective justification' which is 'considerably less than proof of wrongdoing by a preponderance of the evidence.' *United States v. Sokolow*, 490 U.S. 1, 7, 109 S. Ct. 1581, 1585, 104 L. Ed. 2d 1 . . . . " 118 F. 3d at 1431.

The United States Supreme Court has described "reasonable suspicion" as " 'a particularized and objective basis' for suspecting the person stopped of criminal activity." *Ornelas*, 517 U.S. at 696. Something more than an unparticularized suspicion or hunch must be articulated. *United States v. Sokolow*, 490 U.S. 1, 7, 104 L. Ed. 2d 1, 109 S. Ct. 1581 (1989).

Reasonable suspicion can arise from information that is less reliable than that required to show probable cause. Both reasonable suspicion and probable cause are dependent upon the content of information possessed by the detaining authority and the information's degree of reliability. Quantity and quality are considered in the "totality of the circumstances—the whole picture" that must be taken into account when evaluating whether there is reasonable suspicion. *Alabama v. White*, 496 U.S. 325, 330, 110 L. Ed. 2d 301, 110 S. Ct. 2412 (1990).

We now turn to the reasonable suspicion indicators identified here. Weigel said that he usually bases reasonable suspicion on three to five indicators. At the preliminary hearing, Weigel testified that DeMarco's nervousness was the "number one" factor forming the basis of his reasonable suspicion. Weigel's experience was that people are nervous when he first stops them, but as he talks to them, nervousness subsides. According to Weigel, DeMarco's nervousness escalated. He was fidgety, would not sit still, and could not come out with a specific answer about what he was doing. Based on Weigel's personal experience, persistent or escalating nervousness is an indicator that the person might be involved in illegal activity.

DeMarco contends that he naturally talks fast and uses hand gestures when he talks. He points out that Weigel had never spoken with him before the stop. Also, DeMarco was wearing a short-sleeved shirt, and it was a crisp February morning, so he could have been cold.

How should the nervousness factor play out here? Earlier I-70 traffic stop cases are of interest. *Chapman*, 23 Kan. App. 2d 999, affirmed suppression of 120 pounds of marijuana found in a car trunk. Chapman, like DeMarco, failed to signal a lane change. After Chapman was given a warning ticket, he refused to consent to a search of his car. The trooper then called for the narcotics dog. At the suppression hearing, the trooper identified the following "reasonable and articulable suspicion" factors observed during the stop:

"Chapman's extreme nervousness, heavy breathing, and avoiding eye contact; a hotel business card on the floorboard with a handwritten phone number on it; and the fact that Chapman was coming from Phoenix, Arizona, and no luggage or other personal items were visible in the car. [The trooper] asked Chapman whom the car belonged to. Chapman indicated it was his uncle's and told [the trooper] the name of the owner of the car was on the 'paperwork' (registration)." 23 Kan. App. 2d at 1000.

The trooper in *Chapman* initiated a computer search, which showed the driver's license and car registration to be valid. The *Chapman* court relied heavily on the analysis in *United States v. Wood*, 106 F.3d 942 (10th Cir. 1997), in discounting the nervousness factor (involving I-70, the same trooper, and similar facts). 23 Kan. App. 2d at 1006-08.

The Tenth Circuit in *Wood* addressed the nervousness factor:

"It is certainly not uncommon for most citizens—whether innocent or guilty—to exhibit signs of nervousness when confronted by a law enforcement officer. [Citations omitted.] Trooper Jimerson had no prior acquaintance with Mr. Wood which enabled the trooper to contrast Mr. Wood's behavior during the traffic stop with his usual demeanor. [Citations omitted.] . . . Mr. Wood's demeanor during the detention must be discounted given the generic claim of nervousness." 106 F.3d at 948.

The Tenth Circuit revisited the nervousness factor in *United States v. McRae*, 81 F.3d 1528, 1534 n.4 (10th Cir. 1996):

"We have held that nervousness alone is not sufficient to justify further detention; however, in combination with other suspicious circumstances, it might contribute to a finding of articulable suspicion. *Cf. United States v. Fernandez*, 19 F.3d 874, 879-80 (10th Cir. 1994) ('While nervousness may also appear as a factor in many traffic stop cases, we have never held that by itself it creates a reasonable suspicion of criminal activity.')."

Interstate 70 traffic stops provide a source for developing Fourth Amendment jurisprudence in nervousness factor cases. In *United States v. Walker*, 933 F.2d 812, *reh. denied* 941 P.2d 1086 (10th Cir. 1991), *cert. denied* 502 U.S. 1093 (1992), Walker was stopped for speeding. An officer approached Walker, requested his license and registration, and asked where he was coming from. Walker said he was coming from Kansas City and was on his way home. He was nervous. His hands shook. He had difficulty retrieving the license from his wallet. While still holding the license and registration, the officer asked permission to search the vehicle. Walker consented. Cocaine packages were in the trunk, and cash was in the glove compartment. The trial court granted a motion to suppress, deciding that (1) the officer's continued detention of Walker to ask questions unrelated to the traffic stop violated the Fourth Amendment and (2) Walker's nervousness did not create an objectively reasonable suspicion of criminal activity justifying the detention. The trial court did not address the consent issue. The Tenth Circuit agreed that the detention was unlawful and that Walker's nervousness did not provide an objective reasonable suspicion, but remanded for the trial court to address the consent issue.

In *United States v. Soto*, 988 F.2d 1548 (10th Cir. 1993), Soto was also stopped for speeding. He produced the requested driver's license and registration. The name on the license was Guerra and the name on the registration was Corral. Soto said Corral was his uncle, who had lent him the car to drive from Chicago to Los Angeles and back. Soto did not know his uncle's address. Soto appeared nervous, his hands were shaking, and his movements were fast. Before returning the documents to Soto, the officer asked for consent to search the vehicle, and Soto agreed. Drugs were found. Soto's motion to suppress was denied, and the denial was affirmed on appeal. The officer's additional questioning about

drugs and weapons was supported by reasonable suspicion, based on Soto's inability to provide an address for his uncle, combined with his nervousness. The consent was also held to be voluntary.

*United States v. Hall*, 978 F.2d 616 (10th Cir. 1992), although not a traffic stop case, commented on the nervousness factor (seizure of Hall's suitcase at a train station; informant tipped police that Hall might be carrying drugs and would be traveling alone in the sleeper car). The *Hall* court decided the facts did not support a finding of reasonable suspicion to seize the suitcase. Hall's nervousness was the only suspicious factor, and the other factors were consistent with innocent travel. The *Hall* court's observations on the nervousness factor are of interest in the discussion here.

"While a person's nervous behavior may be relevant, we are wary of the objective suspicion supplied by generic claims that a Defendant was nervous or exhibited nervous behavior after being confronted by law enforcement officials, even recognizing that reasonable suspicion may be the sum of noncriminal acts and is based on the totality of the circumstances, *see Sokolow*, 490 U.S. at 7-10, 109 S. Ct. at 1585-87. As we recently observed:

'In all search and seizure cases of the type here concerned, the government argues that a defendant's nervousness, either alone or in conjunction with other factors, supports the contested search or seizure. This repetitive assertion by the Government in all cases of this kind must be treated with caution. It is common knowledge that most citizens . . . whether innocent or guilty, when confronted by a law enforcement officer who asks them potentially incriminating questions are likely to exhibit some signs of nervousness.' [Citations omitted.]" 978 F.2d at 621 n.4.

DeMarco's nervousness alone does not provide sufficient reasonable suspicion of illegal activity.

At the suppression hearing, Weigel testified that I-70 did not seem like an appropriate route for someone to take traveling from California to Florida. The district court discounted the route because DeMarco said that they had stopped in Salt Lake City on the way.

Weigel testified at the preliminary hearing that the inconsistency between DeMarco's and Bennici's stories about how DeMarco got to Los Angeles was a "real good indicator." The district court at the suppression hearing discounted this inconsistency because Bennici also told Weigel that they had traveled separately to Los

Angeles and that DeMarco had arrived in Los Angeles before Bennici. Bennici's confusion on that point was, in the district court's view, understandable.

Discrepancies in travel plans or histories have been used as objective reasonable suspicion factors in other cases, depending on the nature of the discrepancy. "As with unusual travel plans, inconsistencies in information provided to the officer during the traffic stop may give rise to reasonable suspicion of criminal activity." *Wood*, 106 F.3d at 947.

The travel route factor was discussed in *United States v. Mendez*, 118 F.3d 1426. Mendez was stopped for speeding in Colorado. The officer noticed a crooked faceplate on the dashboard. The car's radio was lying in the console. Mendez produced a California driver's license in his name and an Arizona registration in another person's name (said to be his sister's husband). Mendez said he was headed to Colorado Springs to visit his sister. He did not know her address, but knew how to get there. The officer conducted a computer check, which was clear. The officer asked if Mendez was carrying any contraband, which Mendez denied. Mendez consented to a search, signing a consent form. Drugs were found in the car. Mendez' motion to suppress was denied, based on his consent. The appellate court affirmed, finding reasonable suspicion to justify the additional questioning, based on Mendez' vague travel plans, the crooked dashboard, and the dismounted radio. 118 F.3d at 1432.

Travel plans also played a role in the arrest in *United States v. Anderson*, 114 F.3d 1059 (10th Cir. 1997), a Kansas I-70 case. A trooper stopped Anderson for following too close. Anderson said the vehicle belonged to his uncle. The trooper noticed Anderson was wearing a pager. Anderson's license and registration checked out as valid. When asked where he was headed, Anderson said he was going to visit a nephew in Ohio. The trooper asked the female passenger where they were driving. She said that Anderson was going to see about a job at J.B. Hunt and Company. She did not know the location. She thought they were going through Alabama. The trooper saw a CB radio, cellular phone, and a radar detector in the vehicle and detected the smell of air fresheners. Anderson

added that he was applying with J.B. Hunt. When asked for permission to search the vehicle, Anderson told the trooper that he could "scout around." The trooper saw missing screws in the back of the vehicle, and fresh paint and new hoses and clamps around the gas tank. The vehicle was impounded, and cocaine was later found in a hidden compartment. Anderson's motion to suppress was denied. The Tenth Circuit decided that Anderson's consent was valid and that the trooper had probable cause to search the gas tank once evidence of a hidden compartment was found. Among other factors (the pager, air freshener, and evidence of tampering with the gas tank), the conflicting versions of travel itineraries and the passenger's vague travel plans formed part of the basis for finding of probable cause. See also *United States v. Kopp*, 45 F.3d 1450 (10th Cir.), *cert. denied* 514 U.S. 1076 (1995) (a traffic stop for speeding on I-70 in Missouri).

Unlikely travel plans were a factor in denying a motion to suppress in *United States v. Sanchez-Valderuten*, 11 F.3d 985 (10th Cir. 1993). Reasonable suspicion was based on the coffee and air freshener smell (typically used to mask drug odor), Sanchez-Valderuten's unlikely travel plans (I-70 in Utah being far south of the usual route from Washington to New York), and evasive responses concerning his point of departure. Sanchez-Valderuten was also held to have consented to the search. However, in *Wood*, 106 F.3d at 947, an error in identifying the city in which Wood had rented the vehicle was held not "the sort of inconsistency that warrants such a conclusion [of reasonable suspicion of criminal activity]." Also, Wood's arguably implausible vacation plans (unemployed painter taking a lengthy cross-country trip in a rented car) did not provide sufficient reasonable suspicion.

Although Weigel did find an inconsistency between DeMarco's and Bennici's statements about the Florida-to-California leg of the trip, it is not as marked as the inconsistencies in cases we have reviewed denying suppression.

Weigel testified at the preliminary hearing that driving a rental car was another indicator, although "not that important." The fact that DeMarco was coming from Los Angeles seems too innocuous to arouse objective suspicion of criminal activity. Weigel testified

that Los Angeles was a major drug source city and his experience revealed that illegal drugs are often transported in rented vehicles. These two factors cover large groups. We find no explanation in the record why existence of an absentee renter would suggest involvement in criminal activity. In *Wood*, the court did not view Wood's travel in Kansas from California in a rented car as suspicious. The *Chapman* court did not consider as suspicious Chapman's departure from Phoenix, another known narcotics source city.

The circumstances here appear to us similar to those in *Chapman* and *Wood*, where suppression motions were granted and affirmed. *Chapman* involved a nervous driver, although there were apparently no discrepancies or inconsistencies in Chapman's travel plans or other statements. *Wood* also involved a nervous driver who could not identify the city in which the vehicle was rented and gave a questionable vacation itinerary.

We agree with the district court's ultimate conclusion that the evidence should be suppressed. The question is not easy. The case is close. We are guided by our standard of review. We have viewed the videotape; however, the district judge heard the witnesses and observed their demeanor. We will not substitute our view of the evidence for that of the district court when, as here, the motion to suppress is supported by substantial evidence. *State v. Baston*, 261 Kan. 100, Syl. ¶¶ 1-2, 928 P.2d 79 (1996). We do not find the minimum level of objective factors justifying reasonable suspicion necessary to overrule the district court.

Affirmed.