No. 112,212

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee,*

v.

JOHN W. BANNON,
*Appellant.*

SYLLABUS BY THE COURT

1.

K.S.A. 2012 Supp. 21-6302(a)(4) provides a person carrying a concealed weapon (i.e., pistol, revolver, or other firearm) on the person's land or in the person's abode cannot be charged with criminal carrying of a weapon.

2.

As a general rule, criminal statutes are strictly construed in favor of the accused. Additionally, the strict construction rule is constrained by the rule the interpretation of a statute must be reasonable and sensible to effect the legislative design and intent of the law.

3.

The common areas (i.e., the lobby, hallway, and/or other common areas) of an apartment complex are generally not considered part of the abode or curtilage because the tenant does not have exclusive control over access to the common area of the apartment building.

4.

When interpreting a statute, words not defined in the statute must be construed according to their common and approved usage.

5.

Abode is defined as a home; a place of residence. Land is defined as an immovable and indestructible three-dimensional area consisting of a portion of the Earth's surface, the space above and below the surface, and everything growing on or permanently affixed to it; an estate or interest in real property.

6.

An ingress-and-egress easement is defined as the right to use land to enter and leave another's property. Under the facts of this case, it would be the right to use the common areas of the apartment building (i.e., the hallway, stairway, and lobby areas) to come and go from the tenants' apartments.

7.

When reviewing a district court's decision on a motion to suppress, the appellate court applies a bifurcated standard. The appellate court reviews the district court's factual findings to determine whether they are supported by substantial competent evidence. The ultimate legal conclusion is reviewed using a de novo standard. In reviewing the factual findings, the appellate court does not reweigh the evidence or assess the credibility of witnesses.

8.

A law enforcement officer may stop any person in a public place based upon specific and articulable facts raising a reasonable suspicion that such person has committed or is about to commit a crime. *Terry v. Ohio,* 392 U.S. 1, 21, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). K.S.A 22-2402(1), the Kansas stop-and-frisk statute, is a

2

codification of the Fourth Amendment search and seizure principles expressed in *Terry*.

9.

The ultimate question in determining whether property is embraced by a premises' curtilage is whether the area in question is so intimately tied to the home itself that it should be placed under the home's umbrella of Fourth Amendment protection. Four principle factors guide whether the area is under the umbrella of the curtilage: (1) how near the area is to the home; (2) whether any enclosures surrounding the home embrace the area in question; (3) how the area is used; and (4) whether the resident has acted to protect the area from observation by people passing by.

10.

The lobby area of an apartment building is generally not sufficiently private to qualify as curtilage, therefore, it was sufficiently public for a *Terry* stop to occur.

11.

The court must look at each step of the *Terry* stop. Each element, the stop and the frisk, must be analyzed separately; the reasonableness of each must be independently determined.

12.

Testimony about a law enforcement officer's actual, subjective belief about whether a person stopped is armed and presently dangerous, if any, may be one factor to consider when applying the objective reasonableness test used for evaluating the constitutionality of a frisk under *Terry*.

Appeal from Sedgwick District Court; CHRISTOPHER M. MAGANA, judge. Opinion on remand filed January 12, 2018. Affirmed.

3

*Richard Ney*, of Ney & Adams, of Wichita, and *Ian M. Clark*, of Wichita, for appellant.

*Lance J. Gillett*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before STANDRIDGE, P.J., BUSER and SCHROEDER, JJ.

SCHROEDER, J.:  On remand from the Kansas Supreme Court, we address the two issues John W. Bannon raised in the appeal of his jury conviction for criminal carrying of a weapon under K.S.A. 2012 Supp. 21-6302(a)(4). The record reflects Bannon was searched without a warrant in the lobby of Wheatshocker Apartments (Wheatshocker).

Bannon claims he was in lawful possession of his firearm in the front lobby to his apartment building and the lobby qualifies as part of his abode or curtilage. Bannon's argument the lobby qualifies as part of his abode or curtilage to his apartment is not supported by the law and is unpersuasive.

Bannon also asserts the district court erred in not granting his motion to suppress the evidence found as a result of an improper pat-down search. Bannon claims that without a warrant, the officers lacked reasonable suspicion to search him pursuant to *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). Bannon's perception of the restriction placed on officers pursuant to *Terry* is misplaced. Here, based on a tip from a known informant, the officers had reasonable suspicion to believe Bannon was armed with a weapon. Therefore, officers had reasonable suspicion Bannon was presently armed and dangerous, justifying a pat-down search for officer safety or for the safety of the individuals in the apartment lobby. We affirm.

FACTS

Concerned parents of a Wichita State University (WSU) student went to the WSU Police Department to report an incident their son related to them that occurred two weeks prior at his campus residence, Wheatshocker.

Both Sergeant Bryson Potter and Officer Phillip Shelite of the WSU Police Department spoke with the parents who informed them their son, Johnathon Wasserstein, had seen a fellow resident in Wheatshocker carrying a gun. Sergeant Potter had the parents retrieve their son and verified Wasserstein was a WSU student living in Wheatshocker.

Wasserstein told the officers "[a] friend or an acquaintance that told him that he works for Homeland Security; he always has guns on him; he interrogates people. He said that he had his conceal and carry, and he had guns in his apartment, as well." The individual's first name was John and he lived in one of two possible Wheatshocker units—No. 414 or No. 514. Wasserstein provided a physical description of John for the officers and told the officers John took Xanax and Morphine. Wasserstein was explicit that he regularly hung out with John, and John always carried a gun. Officer Shelite confirmed a John Bannon lived in apartment No. 414 at Wheatshocker.

When Sergeant Potter and Officer Shelite arrived at Wheatshocker, they were advised by dispatch a student working at the lobby desk confirmed Bannon was currently sitting in the Wheatshocker front lobby. "The front lobby is right inside [Wheatshocker]. You walk into the apartments and you have a—a desk where a worker always sits, and there's a front lobby. It's a common area with seating and couches and everybody uses it; students hang out there." Sergeant Potter and Officer Shelite observed a number of students in the lobby.

The officers saw a man matching Bannon's physical description sitting in a chair reading in the lobby. The officers approached Bannon. Sergeant Potter asked the individual if his name was John, and he said, "Yes." Sergeant Potter then asked Bannon if he had any weapons on him, and he said, "No." Officer Shelite grasped Bannon by the arm and had him stand up for a quick pat-down. Officer Shelite located a black handgun, loaded with a 15-round clip and a round in the chamber, on Bannon's right hip, inside his waistband, with a shirt over it to conceal it. The officers secured the loaded weapon and placed Bannon in handcuffs. WSU's policy at the time prohibited weapons on campus, and this policy was integrated into Wheatshocker housing contracts.

The State charged Bannon with one count of criminal carrying of a weapon in violation of K.S.A. 2012 Supp. 21-6302(a)(4), a class A nonperson misdemeanor, which prohibited knowingly carrying a firearm concealed on his person, when not on his land, in his abode, or in his fixed place of business.

Prior to trial, Bannon moved to dismiss the charge against him, asserting he could not be convicted because he was carrying a concealed weapon on his land or in his abode. Following an evidentiary hearing, the State filed a memorandum of law, including the student code of conduct, arguing the defenses of carrying on one's land or abode were not available to a defendant who waived his right to carry as part of his rental contract for residency at Wheatshocker. Further, the prohibition against firearms on WSU's campus and in Wheatshocker were reasonable regulations exercised by WSU for the protection and safety of its students. Bannon filed a response arguing WSU's gun policy was irrelevant to the Kansas criminal statute regarding carrying a weapon on one's land or in one's abode.

The district court found the lobby of Wheatshocker was not a part of Bannon's land or abode and he could not claim any statutory exemptions to prosecution for criminal carrying of a weapon. The district court denied Bannon's motion to dismiss.

After his motion to dismiss was denied, Bannon filed a motion to suppress the evidence of the concealed handgun seized from his waist, arguing it was taken during a warrantless search of his person within the curtilage of his apartment or, in the alternative, that the officers lacked reasonable suspicion or probable cause to believe he was committing a crime when they seized and searched him. The State responded, arguing the lobby of Wheatshocker was not curtilage and the seizure of Bannon was a valid investigatory stop.

Following an evidentiary hearing, the district court found the lobby of Wheatshocker was public and not within the curtilage of Bannon's apartment, and the officers had reasonable suspicion of a firearm-related crime or that the impersonation of a law enforcement officer had been or was being committed when they contacted Bannon. Therefore, the pat-down and discovery of Bannon's concealed firearm was constitutionally permissible. A jury subsequently convicted Bannon of criminal carrying of a weapon.

In an opinion dated December 11, 2015, this panel found Bannon's motion to suppress should have been granted because a warrantless pat-down search of Bannon occurred without any evidence that a law enforcement officer had an actual, subjective belief Bannon was armed and presently dangerous. With this lack of evidence, we went on to say the State failed to present evidence to support the second step of a *Terry* stop—that the officers were reasonably concerned for their safety or the safety of others to justify the move to a warrantless pat-down search.

The State requested the Kansas Supreme Court review our decision. The Supreme Court accepted review and found a hybrid approach applied to the second step of the *Terry* stop: testimony as to an officer's subjective belief or fear is a factor to be considered in the objective analysis of the totality of circumstances, but the absence of

such testimony does not invalidate the reasonableness of a frisk. *State v. Bannon*, 306 Kan. 886, 896, 398 P.3d 846 (2017).

ANALYSIS

*Wheatshocker lobby is not part of Bannon's land or abode.*

On appeal, Bannon argues the district court erred when it denied his motion to dismiss because he was legally allowed under K.S.A. 2012 Supp. 21-6302(a)(4) to carry a concealed weapon while on his land or in his abode. Bannon further claims the district court misconstrued the statute when it found the Wheatshocker lobby had to be under Bannon's exclusive control to be considered his land or abode.

Interpretation of a statute is a question of law over which appellate courts have unlimited review. *State v. Eddy*, 299 Kan. 29, 32, 321 P.3d 12 (2014). Bannon was charged with criminal carrying of a weapon in violation of K.S.A. 2012 Supp. 21-6302(a)(4), which states: "(a) Criminal carrying of a weapon is knowingly carrying . . . any pistol, revolver or other firearm concealed on one's person except when on the person's land or in the person's abode or fixed place of business."

Bannon asks this court to find the Wheatshocker lobby was either (1) Bannon's land or (2) an extension of his abode. In his reply brief, Bannon also argues the language of K.S.A. 2012 Supp. 21-6302(a)(4) is clear and unambiguous.

The most fundamental rule of statutory construction is that the intent of the legislature governs if that intent can be ascertained. *State v. Jordan,* 303 Kan. 1017, 1019, 370 P.3d 417 (2016). An appellate court must first attempt to ascertain legislative intent through the statutory language enacted, giving common words their ordinary meanings. *State v. Barlow*, 303 Kan. 804, 813, 368 P.3d 331 (2016). When a statute is plain and

8

unambiguous, an appellate court should not speculate about the legislative intent behind that clear language, and it should refrain from reading something into the statute that is not readily found in its words. *Barlow*, 303 Kan. at 813. Where there is no ambiguity, the court need not resort to statutory construction. Only if the statute's language or text is unclear or ambiguous does the court use canons of construction or legislative history to construe the legislature's intent. *Barlow*, 303 Kan. at 813.

While it is clear a person is exempt from prosecution for carrying a concealed weapon on the person's land or abode under K.S.A. 2012 Supp. 21-6302(a)(4), what is considered one's land or abode is ambiguous. Unfortunately, neither term is defined in the Kansas Criminal Code.

When construing statutes to determine legislative intent, appellate courts must consider various provisions of an act in pari materia with a view of reconciling and bringing the provisions into workable harmony if possible. See *State v. Keel*, 302 Kan. 560, Syl. ¶ 7, 357 P.3d 251 (2015). The courts must construe statutes to avoid unreasonable or absurd results and presume the legislature does not intend to enact meaningless legislation. *State v. Frierson*, 298 Kan. 1005, 1013, 319 P.3d 515 (2014).

As a general rule, criminal statutes are strictly construed in favor of the accused. Additionally, the strict construction rule is constrained by the rule the interpretation of a statute must be reasonable and sensible to effect the legislative design and intent of the law. *Barlow*, 303 Kan. at 813. "Criminal statutes and penalties in effect at the time of a criminal offense are controlling. [Citation omitted.]" *State v. Denney*, 278 Kan. 643, 646, 101 P.3d 1257 (2004).

In its order denying Bannon's motion to dismiss, the district court attempted to define whether the lobby was Bannon's land or abode. The district court was unable to find Kansas caselaw directly on point; however, relying on cases from other jurisdictions

9

dealing with similar statutes, the district court found Bannon did not have exclusive control of the area in question. Therefore, without exclusive control, the lobby did not meet one of the statutory exceptions since the lobby was a semi-private area in the apartment building:

"Bannon was in the residence hall's semi-private lobby. He was clearly not in any way in exclusive control or possession of this area. While the area was not open to all, hundreds of students, along with a few others, had the same level of access and control as Bannon had in this lobby area."

The district court found he could not claim any statutory exemptions under K.S.A. 2012 Supp. 21-6302(a)(4) because the lobby was not a part of Bannon's land, abode, or fixed place of business.

Whether the lobby of an apartment building is considered the tenant's land or abode under K.S.A. 2012 Supp. 21-6302(a)(4) appears to be an issue of first impression in Kansas. The district court was unable to base its decision on any specific Kansas caselaw and neither party relies on Kansas caselaw on appeal. We have found only one other unpublished Kansas case discussing a similar issue. Because so much of the analysis for whether the lobby was an extension of Bannon's land or an extension of his abode is similar, these issues will be addressed together except where distinction is necessary.

*Is the lobby a part of Bannon's land or an extension of his abode?*

When interpreting a statute, words not defined in the statute must be construed according to their common and approved usage. Black's Law Dictionary 1008 (10th ed. 2014) defines land as: "1. An immovable and indestructible three-dimensional area consisting of a portion of the earth's surface, the space above and below the surface, and everything growing on or permanently affixed to it. 2. An estate or interest in real

10

property." Black's Law Dictionary 6 (10th ed. 2014) defines abode as "[a] home; a place of residence." Black's Law Dictionary 619 (10th ed. 2014) defines dwelling-house as "[t]he house or other structure in which one or more people live; a residence or abode." Bannon provides no caselaw on this issue. He argues given the lobby's exclusive and unique characteristics as a controlled area requiring a key card to enter for those who lived there is a factor that weighs in support of his argument. Therefore, given those restrictions and the fact it contained laundry rooms and other facilities common to a home or dwelling, Bannon argues we should construe the front lobby as an extension of his apartment or abode.

Our research reveals a recent unpublished Kansas case discussing whether an entire apartment building could be considered a part of a defendant's dwelling for purposes of a defense of dwelling jury instruction. In *State v. Spangler*, No. 112,270, 2015 WL 3632523, at *8 (Kan. App. 2015) (unpublished opinion), a panel of this court found the common areas of an apartment complex were not considered part of the defendant's dwelling because while Spangler could control access into his individual apartment, he could not prevent other residents or their invited guests access into the building. While not directly on point, we find this same rationale applies to find Bannon's abode was strictly his apartment and did not encompass the front lobby.

While we find little guidance on this point under Kansas law, we found several cases from other jurisdictions that provide us guidance: *Clark v. State*, 49 Ark. 174, 4 S.W. 658 (1887) (Under Mansfield's Digest § 1907, the common stairway of a building, on the upper floor of which defendant and other persons rented and occupied offices for business purposes, is a public place, and cannot be claimed by defendant to be one's own premises.); *State v. Sealy*, 208 Conn. 689, 692, 546 A.2d 271 (1988) ("[T]he stairway and landing in [a] multi-unit dwelling are not part of the defendant's residence or abode."); *Sherrod v. State*, 484 So. 2d 1279, 1281-82 (Fla. Dist. Ct. App. 1986) (Defendant, who was carrying concealed weapon in parking lot of his apartment complex approximately

11

25-to-30 feet from building in which he resided, did not fall within statutory exception to firearms statute for carrying a weapon at his home.); *McNair v. State*, 354 So. 2d 473 (Fla. Dist. Ct. App. 1978) (Defendant was not exempted from the crime of carrying a concealed firearm where he was carrying pistol on his person when he was about 30-to-35 feet from his apartment.); *People v. Wilson*, 29 Ill. App. 3d 1033, 1036, 332 N.E.2d 6 (1975) (Public areas in an apartment building to which tenants and invitees have access are not the abode of any tenant, and thus, tenant who carried concealed weapon into elevator of apartment building did not come within statutory exception.); *State v. Davidson*, 217 N.W.2d 630, 632 (Iowa 1974) (A corridor used in common with tenants and other persons was not within the definition of dwelling house for the purposes of permitting one to carry a concealed weapon.); *Commonwealth v. Dunphy*, 377 Mass. 453, 458, 386 N.E.2d 1036 (1979) (In the prosecution for unlawfully carrying a firearm, whether the defendant's conduct took place in a common area or in an area over which defendant retained exclusive control was crucial to determining criminality of his conduct.); *Commonwealth v. Ortiz*, 558 Pa. 473, 476, 738 A.2d 403 (1999) ("[T]he common meaning of 'place of abode' is the actual house or apartment of a person. It does not include common areas to which a person has a right of access but which are shared with others who have a similar right of access. . . . The shared backyard of the apartment house in which appellee's apartment is located is no more appellee's 'place of abode' than is a tenant's shared elevator or fitness center in a high-rise apartment complex."); *Wilson v. State*, 418 S.W.2d 687, 688 (Tex. Crim. App. 1967) (A tenant who carries a pistol upon the grass, sidewalks, driveway, and parking lot jointly used by all tenants of a large apartment complex is not on one's own premises within meaning of statute relating to unlawful carrying of firearms.); *White v. United States*, 283 A.2d 21, 23 (D.C. 1971) (Since defendant did not have exclusive control and possession of the hallway on the floor above his apartment, he failed to bring himself within the statutory exemption that no person shall carry a pistol without a license except in his dwelling house, place of business or on other land possessed by him.).

Using the analysis in *Spangler* and multiple other jurisdictions as guidance, the Wheatshocker lobby was not an extension of Bannon's apartment or abode. Bannon did not have exclusive control over the area; it was a shared space in which hundreds of students, their guests, WSU staff, and WSU security had access. Additionally, Bannon did not hold legal title to the land, and while legal title is not required, he needed more than nonexclusive permissive use with others.

*Was the lobby an extension of Bannon's land via an easement?*

At the motion to dismiss hearing and on appeal, Bannon argues that while the land might not have been directly his, he acquired an interest in the land via an easement and thus, it should meet the statutory exception. An easement is defined by Black's Law Dictionary as:

> "An interest in land owned by another person, consisting in the right to use or control the land, or an area above or below it, for a specific limited purpose (such as to cross it for access to a public road). The land benefiting from an easement is called the *dominant estate*; the land burdened by an easement is called the *servient estate.* Unlike a lease or license, an easement may last forever, but it does not give the holder the right to possess, take from, improve, or sell the land. The primary recognized easements are (1) a right-of-way, (2) a right of entry for any purpose relating to the dominant estate, (3) a right to the support of land and buildings, (4) a right of light and air, (5) a right to water, (6) a right to do some act that would otherwise amount to a nuisance, and (7) a right to place or keep something on the servient estate." Black's Law Dictionary 622 (10th ed. 2014)

An ingress-and-egress easement is defined as "[t]he right to use land to enter and leave another's property." Black's Law Dictionary 623 (10th ed. 2014).

However, we need not decide that issue. At the time of the stop and frisk, Bannon was not using the lobby under an ingress-egress easement. He was sitting in a chair

reading a book. Thus, the lobby was not being used as an extension of his land covered by an easement to carry directly to and from his apartment. We find under the facts of this case, Bannon had no right under an easement to possess a firearm in the front lobby of Wheatshocker.

*Denial of Bannon's Motion to Suppress*

Next, Bannon argues the district court erred in denying his motion to suppress because (1) the officers violated his constitutional rights by performing a warrantless search within the curtilage of his home and (2) even if the lobby was not considered curtilage, the officers lacked reasonable suspicion to believe Bannon was committing an offense at the time they seized and searched his person.

When reviewing a district court's decision on a motion to suppress, the appellate court applies a bifurcated standard. The appellate court reviews the district court's factual findings to determine whether they are supported by substantial competent evidence. The ultimate legal conclusion is reviewed using a de novo standard. In reviewing the factual findings, the appellate court does not reweigh the evidence or assess the credibility of witnesses. *State v. Patterson*, 304 Kan. 272, 274, 371 P.3d 893 (2016) (reviewing scope of search warrant); *State v. Neighbors*, 299 Kan. 234, 240, 328 P.3d 1081 (2014) (determining if emergency aid exception applied to search of apartment); *State v. Gibson*, 299 Kan. 207, 215-16, 322 P.3d 389 (2014) (motion to suppress inculpatory statements). Substantial evidence refers to legal and relevant evidence that a reasonable person could accept as being adequate to support a conclusion. *State v. Talkington*, 301 Kan. 453, 461, 345 P.3d 258 (2015). When the material facts relating to a search are not in dispute, the appellate court will exercise plenary review of the district court's ruling on a motion to suppress. *State v. Cleverly*, 305 Kan. 598, 604, 385 P.3d 512 (2016). The State bears the burden of proof for a suppression motion. It must prove to the trial court the lawfulness of the search and seizure. *Cleverly*, 305 Kan. at 605.

14

When the trial court has denied a motion to suppress, the moving party must object to the introduction of that evidence at the time it was offered at trial to preserve the issue for appeal. *State v. Richard*, 300 Kan. 715, 726, 333 P.3d 179 (2014). Bannon timely objected and preserved the issue for appeal.

The Fourth Amendment to the United States Constitution and § 15 of the Kansas Constitution Bill of Rights assures each person's right to be secure in his or her person and property against unreasonable searches and seizures. Any warrantless search is per se unreasonable unless it falls within one of the recognized exceptions to the search warrant requirement in Kansas. *Neighbors,* 299 Kan. at 239.

> "A law enforcement officer may stop any person in a public place based upon a specific and articulable facts raising a reasonable suspicion that such person has committed or is about to commit a crime. *Terry v. Ohio,* 392 U.S. 1, 21, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). K.S.A 22-2402(1), the Kansas stop and frisk statute is a codification of the Fourth Amendment search and seizure principles expressed in *Terry.*" *State v. Slater*, 267 Kan. 694, 696-97, 986 P.2d 1038 (1999).

See *State v. Walker*, 292 Kan. 1, 5-6, 251 P.3d 618 (2011) (investigatory stop of pedestrian).

In order for the officers' stop of Bannon to be constitutional, it had to have been made in a public location and the officers had to have reasonable suspicion he was committing or about to commit a crime.

*Was the lobby sufficiently public?*

"The curtilage concept originated at common law to extend to the area immediately surrounding a dwelling house the same protection under the law of burglary as was afforded the house itself." *United States v. Dunn*, 480 U.S. 294, 300, 107 S. Ct.

15

1134, 94 L. Ed. 2d 326 (1987). It is well established curtilage plays a part in interpreting the reach of the Fourth Amendment. *Dunn*, 480 U.S. at 300.

> "The ultimate question in determining whether property is embraced by a premises' curtilage is whether the area in question is so intimately tied to the home itself that it should be placed under the home's umbrella of Fourth Amendment protection. Four principle factors guide whether the area is under the 'umbrella' of the curtilage: (1) how near the area is to the home; (2) whether any enclosures surrounding the home embrace the area in question; (3) how the area is used; and (4) whether the resident has acted to protect the area from observation by people passing by." *State v. Patterson*, 49 Kan. App. 2d 1001, Syl. ¶ 3, 319 P.3d 588 (2014), *aff'd* 304 Kan. 272, 371 P.3d 893 (2016).

As discussed above, Bannon's home is considered to be his apartment and not the halls, stairways, lobby, or other parts of the building accessible to tenants and guests; the front lobby does not qualify as curtilage to Bannon's apartment. Bannon's apartment was on the fourth floor; the lobby was not immediately connected. While there was a lock on the door preventing random individuals from entering the building, approximately 500 WSU resident students had access along with their guests, members of the WSU staff, and the WSU police department. The area was used as an open pass-through space and hangout space for anyone in the building including invited guests. It was not exclusive or private. Finally, Bannon did not act to prevent people passing by from observing what was occurring in the lobby. The lobby was not private and does not qualify as curtilage. Therefore, the front lobby was sufficiently public for the officers to initiate the stop.

Terry *Stop*

*The Stop*

The United States Supreme Court defined the standard for reasonable suspicion in *Alabama v. White,* 496 U.S. 325, 330, 110 S. Ct. 2412, 110 L. Ed. 2d 301 (1990):

"Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause . . . Reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability. Both factors—quantity and quality—are considered in the 'totality of the circumstances—the whole picture,' [citation omitted] that must be taken into account when evaluating whether there is reasonable suspicion."

The Kansas Supreme Court adopted the *White* standard for reasonable suspicion in *State v. DeMarco*, 263 Kan. 727, 735, 952 P.2d 1276 (1998).

In this very case on appeal to the Supreme Court, the court expanded upon the factors to be considered when reviewing whether the actions of law enforcement officers during a *Terry* stop are reasonable. The court must look at each step of the *Terry* stop. "Each element, the stop and the frisk, must be analyzed separately; the reasonableness of each must be independently determined." *United States v. Thomas*, 863 F.2d 622, 628 (9th Cir. 1988).

Sergeant Potter and Officer Shelite had reasonable suspicion that Bannon was violating K.S.A. 2012 Supp. 21-6302. The officers received a verified report Bannon was always carrying a firearm, was telling people he worked for Homeland Security, and was interrogating students on campus. This was not an anonymous report. The report came from a currently enrolled student who also lived in Wheatshocker and was friends with Bannon. There was sufficient reasonable suspicion Bannon was committing a crime to justify an investigatory detention. Since we have determined the officers' initial contact and stop of Bannon was in a public place and was reasonable, we now concentrate on the second step: whether the frisk of his person was reasonable.

*The Frisk*

The Kansas Supreme Court in *Bannon* stated:

"When addressing the second prong, a reviewing court is

"'concerned with more than the governmental interest in investigating crime; in addition, there is the more immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him.' *Terry,* 392 U.S. at 23.

"In light of the number of law enforcement officers killed and wounded in the line of duty each year, law enforcement officers have an interest in protecting themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest. 392 U.S. at 24.

"'When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm.' 392 U.S. at 24." *Bannon*, 306 Kan. at 894.

Next, our Supreme Court looked at the analysis from *State v. Warren*, 78 P.3d 590 (Utah 2003), where the court applied a hybrid approach to address the issue of whether the frisk was reasonable. This approach from the previous standard now expands the old standard of the "objective test" to include the hybrid approach as described below:

"It considered the existence of an officer's subjective belief or fear, if any, as one factor in the totality of circumstances examined in an objective analysis of the totality of the circumstances.

"'Though an officer's subjective belief alone is insufficient to validate or invalidate a *Terry* frisk, to completely disregard an officer's subjective belief excludes a potentially important element of the analysis. . . .

18

"'The totality of the circumstances analysis objectively evaluates all facts before the officer at the time the officer made the decision. The officer, with experience and training, is in the best position to evaluate the circumstances and determine the reasonableness of a *Terry* frisk. We recognize that some officers may never admit that they feared for their safety. Likewise, other officers may always claim they believed a stop was dangerous in order to justify a frisk. Nevertheless, an officer's own evaluation of the circumstances may provide valuable insight to factor into the objective analysis. How much weight this factor is given is a determination for the individual court, though a *Terry* frisk cannot be validated or invalidated based solely on a subjective belief because no one factor alone is determinative of reasonableness. An officer's determination that a person may be armed and dangerous, like an officer's subjective interpretation of the facts to determine that a crime has been or is being committed, is one of several possible articulable facts a court may consider as part of the totality of the circumstances.' [Citations omitted.] *Warren*, 78 P.3d at 596.

"We agree with the Utah Supreme Court that testimony about an officer's subjective belief, if any, may be a factor to consider when applying the objective reasonableness test used for evaluating the constitutionality of a *Terry* frisk. This holding is consistent with this court's earlier observation that reasonableness based on the totality of the circumstances is viewed 'in terms as understood by those versed in the field of law enforcement.' *State v. DeMarco*, 263 Kan. 727, 734, 952 P.2d 1276 (1998).

"'When evaluating these factors, we judge the officer's conduct in light of common sense and ordinary human experience. [Citation omitted.] "Our task . . . is not to pigeonhole each purported fact as either consistent with innocent travel or manifestly suspicious," [citation omitted], but to determine whether the totality of the circumstances [justifies] the detention. [Citation omitted.] We make our determination with deference to a trained law enforcement officer's ability to distinguish between innocent and suspicious circumstances, [citation omitted], remembering that reasonable suspicion represents a "minimum level of objective justification," which is "considerably less than proof of wrongdoing by a preponderance of the evidence."' *United States v. Sokolow,* 490 U.S. 1, 7, 109 S. Ct. 1581, 1585, 104 L. Ed. 2d 1 [(1989)]; [*United States v. Mendez,*] 118 F.3d [1426,] 1431 [(10th Cir. 1997)].' *DeMarco*, 263 Kan. at 735."

19

"In short, an officer's subjective fear or belief that a stopped person is armed and presently dangerous is not individually controlling on the question of reasonableness of a frisk. It is not indispensable, but it is not to be ignored." *Bannon*, 306 Kan. at 896-97.

Applying the hybrid test adopted by our Supreme Court, we believe an objectively reasonable officer investigating the illegal carrying of a gun would have, under the totality of the circumstances, subjectively believed Bannon was presently armed and dangerous. Under our prior opinion dated December 11, 2015, we found the record insufficient to establish that the officers had a subjective belief they needed to do a pat-down search for their safety or the safety of others in the lobby. Such testimony is always beneficial in addressing the reasonableness of the search. But the absence of a particular officer on the scene who will directly testify that he or she actually believed the officer or others were in danger is no longer required. When considering the facts before us under the hybrid test, we examine the subjective information provided by the officers in the process of a *Terry* stop and the totality of the circumstances to weigh the bigger picture surrounding the stop and frisk.

Considering the totality of the circumstances presented in this case, including the officer's testimony, we find it was objectively reasonable for the officers to believe he had a gun and to perform a pat-down search for their safety and the safety of others. As the officers approached Bannon, they had the following objective knowledge from a known informant that Bannon always carried a gun; he used Xanax and morphine; had posed as a federal officer; and had interrogated students. When the officers contacted Bannon, he acknowledged his name upon request and immediately denied carrying a gun. Considering the totality of the circumstances, we conclude the search did not violate Bannon's Fourth Amendment rights and therefore the district court did not err in denying Bannon's motion to suppress.

Affirmed.