NOT DESIGNATED FOR PUBLICATION

No. 117,690

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

BYRON WATKINS JR.,
*Appellant*.

MEMORANDUM OPINION

Appeal from Geary District Court; RYAN W. ROSAUER, judge. Opinion filed May 18, 2018. Affirmed.

*Dakota T. Loomis*, of Law Office of Dakota Loomis, LLC, of Lawrence, for appellant.

*Tony Cruz*, assistant county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before LEBEN, P.J., GARDNER, J., and BURGESS, S.J.

PER CURIAM: Byron Watkins Jr. appeals the district court's denial of his motion to suppress evidence. Finding no error, we affirm.

*Factual and procedural background*

On April 19, 2015, Byron Watkins was driving eastbound on I-70 in Geary County, Kansas, in a Nissan with Antonio Bowen. Captain Eric Coffman of the Geary County Sheriff's Department and Officer Nick Blake from the Junction City Police Department were driving westbound on I-70. Coffman has spent over 20 years in law

1

enforcement and is trained in drug detection, interdiction, and identification; drug operations; and counter drug measures. The two officers observed the Nissan changing lanes without signaling. Coffman crossed the median, caught up with the Nissan, and conducted a traffic stop.

When Coffman initially approached the car on the passenger's side, he noticed that the passenger, Bowen, seemed extremely nervous. He noticed that Bowen's breathing was low and labored, and his heart rate was extremely high—his "pulse was jumping out of his neck." Bowen completely ignored that the officer was at his window. He had his head tilted back on the seat, kept his eyes closed, and pretended to be asleep. Coffman said that although most people are nervous when pulled over, Bowen's nervousness, based on Coffman's impression over thousands of stops, was "extreme," "probably a nine or ten on a scale of one to 10."

Coffman contacted the driver, Watkins, and explained the reason for the stop. Watkins gave Coffman his driver's license and the rental agreement for the car. When Coffman asked where they were going, Watkins replied they were driving from Salina to St. Louis, but he mispronounced "Salina."

Coffman took Watkins' documents and brought them back to his patrol vehicle to run his information through dispatch. Blake brought Watkins to the patrol car to sit in the front seat while Coffman filled out and explained the citation. Coffman wanted Watkins in his patrol car because it was "kind of hard to hear" and he wanted to be sure Watkins could understand him. Coffman asked Watkins questions about his travel. Watkins again said that they had been in "Saleena" visiting a friend named Akim Ashford. He said that they stayed with Ashford, and his residence was more in the country than in the city. Watkins could not recall Ashford's address, although Ashford was a family friend.

Blake then briefly spoke with Bowen. Blake also noticed Bowen was very nervous. Blake saw Bowen's carotid artery thumping and his pulse pounding in the area of the stomach and noticed Bowen was chain smoking cigarettes. When Blake asked him whether any weapons were in the vehicle, Bowen did not give him a straight answer. Bowen's behavior made Blake nervous.

Coffman issued Watkins a warning citation, shut off his forward facing lights, returned all of Watkins' documents, and told Watkins he was free to go. Coffman then immediately asked Watkins if he could ask him more questions. Watkins, who remained in the patrol car, agreed. Coffman testified that if Watkins had not agreed to continue to speak with him, he would have let him leave. Coffman then asked Watkins only one question—whether he could speak with Bowen. Watkins agreed.

Watkins then left the patrol car and tried to re-enter his own vehicle where Bowen was, but Coffman asked him three times to stand outside while he spoke with Bowen, which Watkins agreed to do. Coffman was unsure if Watkins heard his first two questions to that effect. Watkins testified he did not hear Coffman's first request. Coffman wanted Watkins to stay outside the car for their safety and because he did not want Watkins answering questions before Bowen did. Coffman pointed to a spot for Watkins to stand near the front bumper of the patrol car, away from traffic.

Coffman then spoke to Bowen, who said that the purpose of their trip was to take Ashford from St. Louis back to Salina and to visit him there. He also said that they had stayed in Salina in a hotel, not with Ashford. Coffman noticed that Bowen was still acting "extremely nervous" and would not make eye contact with him. The combination of the extreme nervousness from a passenger who was not facing any penalty or citation, the mispronunciation of Salina, and the inconsistent answers from Bowen and Watkins led Coffman to believe the two were engaged in criminal activity. Coffman then re-approached Watkins and asked him for permission to search his car. When Watkins

3

denied permission, Coffman called for a drug dog and detained the two for eight or nine minutes until the dog arrived.

The canine officer and his dog, Scooby, arrived at the scene approximately eight minutes later. What did Scooby do? He alerted or indicated to the presence of narcotics. The officers found a loaded firearm in the center console and a duffle bag of marijuana, six cell phones, and approximately $1,000 in cash in the trunk. Watkins was arrested and was charged with several drug-related offenses.

Before trial, Watkins filed a motion to suppress. The district court denied it, finding, as to the initial stop: "The officers had a reasonable suspicion that a traffic offense occurred when they saw the Nissan fail to use its signal to indicate a lane change." As to whether the traffic stop then became a voluntary encounter, it found: "[T]he encounter . . . turned consensual once law enforcement effected the original purpose of the stop. The court finds nothing coercive about the nature of the interaction between the two officers and Watkins." It found that Watkins consented to further questioning and to waiting while Coffman spoke to Bowen and that a reasonable person would have felt free to leave. Finally, as to the subsequent detention, the district court found that Coffman, after speaking with Bowen, had reasonable suspicion to detain the men until a K-9 unit arrived. He concluded that any reasonable officer would have thought the defendants' description of the trip was a cover story for criminal activity.

After a bench trial, the district court found Watkins guilty of one count of possession of marijuana with intent to distribute, one count of no drug tax stamp, and one count of possession of marijuana. Watkins appeals, challenging the district court's denial of his motion to suppress.

*Did reasonable suspicion support the initial car stop?*

*Standard of review*

This court applies a bifurcated standard of review to a district court's decision on a motion to suppress. We review the district court's factual findings to determine whether they are supported by substantial competent evidence and its ultimate legal conclusions using a de novo standard. In reviewing the factual findings, we do not reweigh the evidence or assess the credibility of witnesses. *State v. Patterson*, 304 Kan. 272, 274, 371 P.3d 893 (2016).

*Analysis*

Watkins first contends that Coffman lacked reasonable suspicion to stop his car because he did not arguably violate the traffic statute for which the officer stopped him.

Watkins' argument is rooted in Fourth Amendment principles. The Fourth Amendment to the United States Constitution protects against unreasonable searches and seizures. *State v. Sharp*, 305 Kan. 1076, 1081, 390 P.3d 542 (2017). A traffic stop is a seizure of the driver of the vehicle for Fourth Amendment purposes. *City of Atwood v. Pianalto*, 301 Kan. 1008, 1011, 350 P.3d 1048 (2015). A search or seizure performed without a warrant is presumptively unreasonable unless an exception to the warrant requirement applies. *State v. Cleverly*, 305 Kan. 598, 604, 385 P.3d 512 (2016). One such exception is an investigatory detention based on reasonable suspicion. K.S.A. 22-2402; *Terry v. Ohio*, 392 U.S. 1, 18-19, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968); *State v. Thompson*, 284 Kan. 763, 772, 166 P.3d 1015 (2007). This *Terry* exception, which the district court applied here, requires the officer conducting the stop to know of "specific and articulable facts that create a reasonable suspicion the seized individual is committing, has committed, or is about to commit a crime or traffic infraction." *State v.*

5

*Jones*, 300 Kan. 630, 637, 333 P.3d 886 (2014). See K.S.A. 22-2402(1); *State v. DeMarco*, 263 Kan. 727, 734, 952 P.2d 1276 (1998).

Coffman and Blake stated they pulled Watkins over because he violated K.S.A. 8-1548(b), which provides: "A signal of intention to turn or move right or left when required shall be given continuously during not less than the last one hundred (100) feet traveled by the vehicle before turning."

Watkins argues that this statute requires a driver to signal only before changing lanes and not while changing lanes. He thus reads "before turning" to mean before the turn starts, rather than before the turn ends. Watkins relies on Coffman's testimony that when he first noticed the vehicle it was straddling the lanes, already in the middle of the lane change. Watkins concludes that because Coffman did not see the car before it began its lane change, Coffman could not find Watkins in violation of K.S.A. 8-1548.

But Watkins' argument discounts Blake's testimony. Blake testified that he observed the full lane change and did not see any signal either before or during the movement, stating: "I observed, I believe it was a light blue or silver Nissan passenger vehicle traveling in the right lane. I observed it move from the right lane to the left lane without giving any signal." Blake thus saw Watkins' vehicle immediately before it turned but saw no turn signal. This constitutes a violation of K.S.A. 8-1548, even if we assume, without deciding, that Watkins' interpretation of the statute is correct.

We thus need not reach Watkins' argument regarding the officers' mistake of law. See *Heien v. North Carolina*, 574 U.S. __, 135 S. Ct. 530, 536-40, 190 L. Ed. 2d 475 (2014) (finding objectively reasonable mistakes of law compatible with the concept of reasonable suspicion). The officers' observation of Watkins' violation of K.S.A. 8-1548 provided them with reasonable suspicion that Watkins violated a traffic law, justifying their initial stop of the car.

6

*Did the detention become a voluntary encounter?*

Watkins next argues that his detention continued after the traffic stop ended and never became a voluntary encounter.

*Analysis*

A driver may be detained after a routine traffic stop if the encounter becomes consensual. *DeMarco*, 263 Kan. at 734. Prolonging the stop is permissible either when an officer has gained a reasonable suspicion of criminal activity or when the driver voluntarily consents to answering additional questions. 263 Kan. at 734. Law enforcement's interaction with an individual is consensual, and therefore not a seizure, if under the totality of the circumstances, the officer's conduct conveys to a reasonable person that he or she was free to refuse the requests or otherwise end the encounter. *State v. Pollman*, 286 Kan. 881, 887, 190 P.3d 234 (2008); *Thompson*, 284 Kan. at 775-76.

Factors that point toward the voluntariness of an encounter include "knowledge of the right to refuse, a clear communication that the driver is free to terminate the encounter or refuse to answer questions, return of the driver's license and other documents, and a physical disengagement before further questioning." *Thompson*, 284 Kan. at 811. Several of these factors are present here, as it is uncontested that Coffman completed the tasks incident to the traffic stop, returned all of Watkins' documents, and then told him he was free to go. Coffman then asked Watkins if he would be willing to answer more questions and Watkins agreed. The only question Coffman asked was whether he could speak with Bowen. Watkins agreed to that request and then agreed to wait outside the vehicle.

Factors that tend to establish that the encounter was not truly voluntary include:

"[T]he threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person, the use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory, the prolonged retention of a person's personal effects such as identification, a request to accompany the officer somewhere, interaction in a nonpublic place, absence of other members of the public, or the display of emergency lights." *Thompson*, 284 Kan. at 811.

Watkins does not rely on those factors but instead lists numerous other factors that purportedly show he was not free to terminate the encounter. But some of them occurred only during the initial investigatory stop and are not relevant to the question of whether the subsequent encounter was voluntary. Watkins' first three factors—that he was not allowed to re-enter the vehicle, that he attempted to re-enter the vehicle and was stopped from doing so, and that Coffman repeatedly requested that Watkins stand away from the vehicle—are the strongest. But these factors essentially make the same point: that after Watkins agreed to answer more questions and to let Coffman speak to Bowen, Coffman repeatedly asked him to stand near the patrol car's front bumper. Coffman testified he did so for safety purposes and to prevent Watkins from tainting any responses from Bowen. But "an officer's order that a person either exit or remain in a vehicle is a small intrusion on individual liberty," and the risk of harm to both the police and the occupants of a stopped vehicle is minimized if the officers routinely exercise unquestioned command of the situation. *State v. Reiss*, 299 Kan. 291, 301, 326 P.3d 367 (2014) (citing *Arizona v. Johnson*, 555 U.S. 323, 330, 129 S. Ct. 781, 172 L. Ed. 2d 694 [2009]). Here, as in *Reiss*, the officer's repeated requests for the driver to move were natural and appropriate means to help him maintain command of the scene to keep it safe for officers and the public. And Coffman repeated his request only because Watkins did not seem to have heard the initial request.

Watkins remained inside the patrol vehicle when Coffman asked him to answer more questions; thus, there was no physical disengagement from the termination of the

traffic stop. But no facts indicate that Coffman asked to prolong the stop in a coercive or aggressive manner, and Coffman acknowledged that if Watkins had said no, he would have let him go. And Watkins left the patrol car within a few seconds after Coffman told him he was free to go, as it took only a few seconds for Coffman to request permission to ask him and Bowen more questions.

Conflicting testimony was given about the patrol vehicle's emergency lights. Watkins believed the patrol vehicle's flashing lights remained on because he did not see Coffman do anything to turn them off. But Watkins admitted that if the video shows the lights were off, then he would be wrong. Coffman testified he shut the front-facing emergency lights off five minutes before he returned all of Watkins' documents and before he asked for consent to ask him more questions, "because he knew he was going to ask him for a consensual encounter." In reviewing the factual findings, we do not reweigh the evidence or assess the credibility of witnesses. *Patterson*, 304 Kan. at 273. But the video of the stop shows that the reflection of the patrol car's lights on the rental car stopped at 9:42 p.m., the same time Coffman said he turned the emergency lights off, and one can hear an audible beep at that time as well. The video thus confirms Coffman's testimony that the emergency lights were off at the time he asked Watkins if he could ask him and Bowen more questions.

"Considered as part of the totality of the circumstances, the presence or absence of emergency lights may or may not be significant; emergency lights may signify different meanings under different circumstances." *Thompson*, 284 Kan. at 808. When emergency lights are activated to initiate a traffic stop, they clearly signal a seizure. But use of the lights may not convey a seizure or show of authority "after a traffic stop concludes and the officer returns to the patrol car but keeps the lights activated for safety reasons while stopped on the side of the roadway." 284 Kan. at 809. Such is the case here. Because Coffman told Watkins he was free to go and permitted him to leave the patrol vehicle, a

9

reasonable person would believe he was free to go even if the emergency lights remained on after the traffic stop was concluded.

We find no indicia of coercion here. Although two uniformed officers were present, no evidence shows that either officer acted in a threatening manner, touched Watkins, displayed a weapon, or used aggressive language or tone of voice to show authority. Coffman informed Watkins that the initial stop was over and that he was free to leave, and Watkins knew of his right to refuse to answer further questions. Coffman timely returned Watkins' license and other documents before asking his permission to continue asking questions. Throughout the interaction, which occurred in a public place, Watkins did not ask Coffman if he was still free to go, tell Bowen to end the questioning, or tell Coffman he wanted to leave. The district court correctly determined that a reasonable person would feel free to terminate the encounter or deny the request of the officers. Thus, at the conclusion of the initial traffic stop, the encounter became voluntary.

*Did reasonable suspicion support Watkins' subsequent detention?*

After speaking with Bowen during the voluntary encounter, Coffman asked Watkins for consent to search the vehicle. When Watkins denied consent, Coffman detained him and called a K-9 unit. Watkins alleges Coffman lacked reasonable suspicion of a crime as was necessary to legally detain him.

*Analysis*

The State bears the burden of proving the lawfulness of the search and seizure. *State v. Garcia*, 250 Kan. 310, Syl. ¶ 1, 827 P.2d 727 (1992). Reasonable suspicion requires a law enforcement officer "'be able to articulate more than an "inchoate and unparticularized suspicion or 'hunch'" of criminal activity.' [Citations omitted.]" *State v.*

10

*Thomas*, 291 Kan. 676, 688, 246 P.3d 678 (2011). Instead, an officer's reasonable suspicion must be based on a "'particularized and objective basis for suspecting the person stopped is involved in criminal activity.'" *Pollman*, 286 Kan. at 890. Reasonable suspicion "depends on the totality of circumstances in the view of a trained law enforcement officer." *State v. Martinez*, 296 Kan. 482, 487, 293 P.3d 718 (2013). Looking at the totality of the circumstances while also taking into consideration the experiences of a trained law enforcement officer "allows officers to draw on their own experiences and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.' [Citations omitted.]" *United States v. Arvizu*, 534 U.S. 266, 273, 122 S. Ct. 744, 151 L. Ed. 2d 740 (2002). Reasonable suspicion represents a "minimum level of objective justification" which is "'considerably less than proof of wrongdoing by a preponderance of the evidence.'" *State v. Johnson*, 293 Kan. 1, 6, 259 P.3d 719 (2011).

Coffman's testimony shows that his decision to detain Watkins and Bowen was based primarily on these factors: Bowen's display of extreme nervousness, Bowen's pretending to sleep, Watkins' mispronunciation of Salina, and the glaring inconsistencies between the travel accounts given by Watkins and Bowen.

When a motorist detained for a traffic violation shows unusual signs of nervousness, his or her actions may be considered as part of the totality of the circumstances a reasonable law enforcement officer would consider. *United States v. Johnson*, 364 F.3d 1185, 1192 (10th Cir. 2004). Ordinary nervousness has limited significance in determining reasonable suspicion because it is a common and natural reaction. But extreme nervousness is a relevant factor, although not a strong one, supporting reasonable suspicion. *State v. Moore*, 283 Kan. 344, 358-59, 154 P.3d 1 (2007). Extreme nervousness is especially relevant when it continues through the entire encounter, instead of dissipating over time. *United States v. Williams*, 271 F.3d 1262, 1269 (10th Cir. 2001). Such is the case here.

11

The level of nervousness the officers observed from Bowen was, by any measure, extreme. Bowen would not give the officers a straight answer when asked if there was a weapon in the car. The physical signs of his nervousness were so pronounced that Blake could see an artery in Bowen's neck thumping and his stomach pulsing through his clothes. Coffman testified that although many people display signs of nervousness when interacting with law enforcement, these were abnormal physical manifestations of nervousness. Bowen's extreme nervousness did not subside over time as it often does as a car stop continues; instead, Bowen displayed these signs throughout the entire interaction. Coffman also noted that it was more uncommon for a passenger to act this way than for a driver to do so. Coffman considered Bowen's nervousness to be extreme based on his experiences over the years, and he scored Bowen's nervousness as nine on a scale of one to ten.

Coffman also found Bowen's behavior to be unusual because his eyes were closed and he pretended to be asleep. Deceptive behavior is a factor adding to the reasonable suspicion analysis. See, e.g., *Hicks v. Kansas Dept. of Revenue*, No. 114,643, 2016 WL 3960893, at *5 (Kan. App. 2016) (unpublished opinion).

The mispronunciation of "Salina" made Coffman wonder whether Watkins had merely seen a sign for Salina or had merely stopped there for a purchase, instead of planning a trip to Salina. It thus added to his suspicion that Watkins was lying.

Most significantly, Coffman relied on the inconsistent statements from Watkins and Bowen as a basis for reasonable suspicion. Inconsistencies in travel plans or other information provided to the officer may be considered as part of the totality of the circumstances a reasonable law enforcement officer would consider. *DeMarco*, 263 Kan. at 739; *United States v. Wood*, 106 F.3d 942, 947 (10th Cir. 1997).

12

Watkins contends that he and his passenger gave only slightly different accounts of their travel. The record confirms that Watkins and Bowen agreed upon a number of things—they traveled from St. Louis to Salina, they visited Akim Ashford, and they were returning to St. Louis. But their stories conflicted in significant ways. They did not agree whether they had stayed in Ashford's residence or in a motel, whether they had stayed in Salina or in a rural area, or whether Ashford had traveled with them from St. Louis to Salina or had merely met them in Salina. And they did not know Ashford's address. Coffman testified that drivers who do not know the address of their destination often produce the address from their phone. Not so here. Further, the inconsistencies all involved events that had happened in the last 24 hours and that Watkins and Bowen had supposedly done together, not future plans about which some variance may more reasonably be the product of innocent misrecollection.

We agree that Coffman had reasonable suspicion to believe that Watkins and Bowen were engaged in illegal activity, thus detaining Watkins and Bowen for nine minutes to wait for the drug dog to arrive was not unreasonable.

We find no violation of the Fourth Amendment. We thus affirm the denial of Watkins' motion to suppress.